**UNITED STATES of America et al., Plaintiffs,**

**and**

**Makah Indian Tribe, Plaintiff-Intervenor/Appellant,**

**v.**

**LOWER ELWHA TRIBE, Plaintiff-Intervenor/Appellee,**

**v.**

**STATE OF WASHINGTON et al., Defendants.**

**No. 79–4066.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1980.

Decided March 23, 1981.

Al J. Ziontz, Seattle, Wash., argued, Moshe J. Genauer, Mason D. Morisset, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., on brief, for Makah Indian Tribe.

Phillip E. Katzen, Seattle, Wash., for Lower Elwha Tribe.

Before WRIGHT and CANBY, Circuit Judges, and PATEL, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

In 1855 the United States signed treaties with several Pacific Northwest Indian tribes, including the parties to this appeal. The tribes agreed to live on reservations but reserved "[t]he right of taking fish at usual and accustomed grounds and stations ... in common with all citizens of the United States." [1]

Earlier in this litigation, the Supreme Court rejected the contention that the treaties merely gave Indians an equal opportunity to try to catch fish. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 674–85, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979). The Court held that the treaties reserved to the tribes the right of taking up to 50% of the harvestable fish on runs passing through usual and accustomed grounds to satisfy tribal needs. *Id.* at 685, 99 S.Ct. at 3074.[2]

The initial district court decision by Judge Boldt determined that the Makah Tribe had usual and accustomed fishing grounds on much of the northern Olympic Peninsula. *United States v. Washington*, 384 F.Supp. 312, 364 (W.D.Wash.1974), aff'd, 520 F.2d 676, 682 (9th Cir. 1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97.[3]

The present dispute arose when the Makah and Lower Elwha Tribes both claimed rights to fish in certain areas initially found to be Makah fishing grounds. The Lower Elwha Tribe contended that it, rather than the Makah Tribe, had primary Indian fish-

ing rights in its aboriginal territory east of the Hoko River. The Lower Elwha also sought joint fishing rights on the Hoko, which at treaty times separated the two tribes.

The district court found that the disputed areas were usual and accustomed fishing grounds of both tribes. *United States v. Washington*, 459 F.Supp. 1020, 1049, 1066. But it found that the treaty-time Elwha Tribe had the right to preclude Makah fishing east of the Hoko and that the present-day Lower Elwha could exercise the same right. *Id.* at 1066–68. The court also found that the treaty-time Makah controlled fishing west of the Hoko and that the Hoko was subject to joint use and control. Fishing rights in these places were allocated accordingly. *Id.* at 1067.

On appeal, the Makah Tribe challenges the district court's findings concerning treaty-time rights. The Tribe further contends that, even if the Lower Elwha had the right at treaty time to exclude the Makah from areas east of the Hoko, that right is not protected by treaty and is not enforceable now in federal court.

## I.

The district court's findings of fact must be upheld unless they are clearly erroneous. Fed.R.Civ.P. 52(a).

### A. Rivers East of the Hoko

■ The finding that the Lower Elwha Tribe controlled fishing east of the Hoko River rests primarily on the testimony of Dr. Barbara Lane, an anthropologist. She testified that the treaty-time Elwha occu-

---

* Of the Northern District of California.

1. Treaty of Point No Point, 12 Stat. 933, 934 (signed January 26, 1855; ratified, March 8, 1859; proclaimed, April 29, 1859). The Elwha Indians were a party to this treaty.

    Substantially identical language appears in the Treaty with the Makah, 12 Stat. 939 (signed January 31, 1855; ratified, March 8, 1859; proclaimed, April 18, 1859).

2. *See generally* Case Note, Fishing Vessel Association: *Resolution of Indian Fishing Rights*

under *Northwest Treaties*, 16 Willamette L.Rev. 931 (1980).

3. The district court retained jurisdiction after the cited phase of the case to determine the many complex issues that remained and to ensure enforcement. The core of the initial decision was ultimately upheld by the Supreme Court in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 685, 99 S.Ct. 3055, 3074, 61 L.Ed.2d 823 (1979). For the full history of the case, *see* Case Note, *supra* note 2.

pied the area east of the Hoko and considered it their territory.

She stated that the prevailing conception of tribal territory among Northwest Indians comprised the right to exclude members of other tribes.[4] She conceded that Makahs fished east of the Hoko, but maintained that this fishing, to be consistent with the Indian conception of tribal territory, had to be with the express permission of the Elwha or by virtue of intermarriage.

The Makah Tribe denies that its fierce ancestors would have deigned to ask permission to fish in Elwha territory and contends that the district court's determination is wholly unsupported by the record because the court relied on an "anthropological principle" rather than specific facts.

The Makah contention is without merit. Historical evidence of tribal custom is a proper basis for judicial conclusions about the present effect of Indian treaty provisions. *See United States v. Top Sky*, 547 F.2d 486, 487 (9th Cir. 1976). Here, it may be the only probative evidence available.[5]

The Makah point to an incident reported by a nineteenth century journalist, James Swan, in which several Makah fishermen went fishing in Elwha territory and beheaded the Elwha Indians who tried to stop them.[6] The significance of this incident is unclear, and it is not necessarily inconsistent with Lane's testimony that only the Elwha had a recognized right to fish in Elwha territory.

### B.  *The Hoko River*

Anthropological evidence established that the Hoko River was subject to joint use and control in treaty times. Contending that the Hoko should be subject to their exclusive control, the Makah relied on the testimony of an archaeologist who said he found Makah baskets about 2,000 years old at the Hoko River.

Judge Boldt found the anthropologist's interpretation more persuasive. He noted that the archaeological evidence had nothing to do with use of the Hoko River at treaty times and, at most, proved only that Makah baskets had once been used at the Hoko. They could have been obtained through trade or used by the Makah wives of Elwha Indians. In any event, Makah presence on the Hoko is not inconsistent with Elwha presence there.

### C.  *Substantial Evidence*

We conclude that the district court's factual determination was supported by substantial evidence and was not clearly erroneous.

### II.

The Makah Tribe insists that considerations of law and equity require that it be allowed to share the rivers east of the Hoko even if the district court correctly determined that treaty-time Elwha Indians had a right to control the fishing places in Elwha territory. The Lower Elwha Tribe points out that the Makah Tribe has access to several rivers and to marine waters. More to the point, hardship to the Makah cannot deprive the Elwha of vested treaty rights.

The treaties "secured," or reserved, to the tribes their pre-treaty rights to take fish. *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905); *accord, Washington v. Washington State Commercial Passenger Fishing Vessel*

---

4.  Dr. Lane amplified this principle by identifying four specific factors to be considered in determining whether a tribe legitimately controlled an area: (1) proximity of the area to tribal population centers, (2) frequency of use and relative importance to the tribe, (3) contemporary conceptions of control or territory, and (4) evidence of behavior consistent with control.

5.  Even if Dr. Lane's conclusions about the customary rights of a tribe in its territory were not probative of rights actually exercised, they would be probative of the reasonable expectations of the treaty signatories.

6.  J. Swan, *Almost Out of the World: Scenes from the Washington Territory, the Straits of Juan de Fuca, 1859–1861* (defendants' exhibit).

*Ass'n,* 443 U.S. at 685, 99 S.Ct. at 3070.[7]  In defining the scope of these rights, the treaties "must be construed, not according to the technical meaning of [their] words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Id.* at 676, 99 S.Ct. at 3067 (quoting *Jones v. Meehan,* 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899)).

█ We may infer that the tribes reasonably understood themselves to be retaining no more and no less of a right vis-à-vis one another than they possessed prior to the treaty.[8]  The pre-treaty Elwha Tribe claimed and exercised the primary right to take fish on the rivers east of the Hoko within its territory.  Members of the Makah Tribe fished on those rivers only by permission, through intermarriage, or on illicit incursions into Elwha Territory.

These instances of Makah fishing on Elwha territory do not destroy the Elwha Tribe's primary right.  *Cf.* Clinton & Hotopp, *Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Eastern Land Claims,* 31 Maine L.Rev. 17, 70 (1979) ("[t]emporary occupancy by friends or raiding by enemies does not destroy the exclusive occupancy required for aboriginal title" under 25 U.S.C. § 177 once exclusive occupancy has been established).

We conclude that the Lower Elwha Tribe is entitled to exercise the primary Indian fishing right on the disputed rivers east of the Hoko and that Makah fishing in that area is subject to Elwha permission.  The Hoko River remains a joint fishery.  These are the "right[s] of taking fish" that were secured by the treaties, and these are the rights enforceable today.

AFFIRMED.

7. In *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed.2d 1089 (1905), the Supreme Court addressed the Pacific Northwest fishing treaties and observed that they did not create the fishing rights asserted but reserved pre-existing rights.  The rights themselves were derived from aboriginal possession.  *See* F. Cohen, *Federal Indian Law* 593 (rev.ed.1958).

8. The district court earlier held that when fish runs extend through the usual and accustomed grounds of more than one tribe, disputes among the tribes shall be resolved by the tribes

themselves.  384 F.Supp. at 417;  *see* 443 U.S. at 671, 99 S.Ct. at 3067.

Here, however, the issue is primary control of Indian fishing grounds, not sharing of fish runs that pass the accustomed fishing grounds of more than one tribe.

We see no inconsistency in holding that the treaties secure the Elwha Tribe's primary right vis-à-vis other tribes to fish in its aboriginal territory while they do not mandate a precise formula for sharing fish runs that pass through other territory.