764 F.2d 670
 UNITED STATES of America, Plaintiff,
and
Quinault Indian Tribe, et al., Plaintiffs-Intervenors,
and
The Suquamish Indian Tribe, Plaintiff-Intervenor-Appellant,
v.
The SKOKOMISH INDIAN TRIBE, Plaintiff-Intervenor-Appellee,
v.
STATE OF WASHINGTON, et al., Defendants.
 No. 84-3894.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 2, 1985.
Decided June 25, 1985.
 
 Joanne Foster, Browne, Ressler & Foster, Seattle, Wash., for plaintiff-intervenor-appellant.
 Gregory M. O'Leary, Wickwire, Lewis, Goldmark & Schorr, Seattle, Wash., for plaintiff-intervenor-appellee.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT, KENNEDY, and ANDERSON, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 In 1855, the United States signed treaties with several Pacific Northwest Indian tribes, including the Skokomish and Suquamish Indian Tribes. The treaties reserved to the signatory tribes their pre-treaty fishing rights in relation to one another.
 
 
 2
 The district court found that the Twana Tribe (the aboriginal predecessor in interest of the Skokomish) had a primary right to fish the Hood Canal and its watershed area. A primary right is the power to regulate or prohibit fishing by members of other treaty tribes. The Suquamish Tribe seeks reversal of the district court's judgment to avoid such regulation where the adjudicated "usual and accustomed fishing places" of the Suquamish in the Hood Canal area overlap with those of the Skokomish. We affirm the decision of the district court.
 
 I. Res Judicata
 
 3
 In United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974) (Boldt I ), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), the district court determined several matters concerning off-reservation treaty-time fishing rights, including that the usual and accustomed fishing places of the Skokomish were the Hood Canal and all the waterways draining into it. 384 F.Supp. at 377. Additionally, the court stated that it would retain continuing jurisdiction to determine, inter alia, "the location of any of a tribe's usual and accustomed fishing grounds not specifically determined by [Boldt I ]," and "such other matters as the court may deem appropriate." Id. at 419.
 
 
 4
 The district court implemented Boldt I with numerous orders and memorandum decisions. United States v. Washington, 459 F.Supp. 1020 (W.D.Wash.1974-1978) (Boldt II ), various appeals dismissed, 573 F.2d 1117 (9th Cir.1978), 573 F.2d 1118 (9th Cir.1978), 573 F.2d 1121 (9th Cir.1978), aff'd sub nom. Puget Sound Gillnetters Association v. United States District Court, 573 F.2d 1123 (9th Cir.1978), aff'd in part, vacated in part, and remanded sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). The Suquamish intervened, and received a determination that the usual and accustomed fishing places of the Suquamish included the Hood Canal. 459 F.Supp. at 1049. The Suquamish contend that since the Skokomish Tribe did not claim that it had a primary right to fish in the Hood Canal basin during the Boldt II proceeding, the claim is now barred by res judicata.
 
 
 5
 As stated in Nevada v. United States, 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983):[T]he doctrine of res judicata provides that when a final judgment has been entered on the merits of a case, "[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." The final "judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever."
 
 
 6
 Nevada, 463 U.S. 129-30, 103 S.Ct. at 2918, 77 L.Ed.2d at 524 (citations omitted).
 
 
 7
 In addition to determining the usual and accustomed fishing places of the Suquamish and other tribes, the court in Boldt II also determined the existence of a primary right in the Lummi Tribe in the Hale Passage, 459 F.Supp. at 1049. Since these findings were made on a prima facie showing, the court provided that if any party requested a reconsideration during the following month, a full evidentiary hearing would be conducted. If no reconsideration was requested, the findings were to become "final and reviewable." Id. Only the Makah Tribe requested reconsideration with respect to the usual and accustomed fishing places of the Lower Elwha Tribe. Id. at n. 7. After finding that there was no dispute respecting common fishing areas, the court determined the two tribes' primary rights in these areas. Id. at 1067.
 
 
 8
 Since the Boldt II court did entertain the primary right claims of three tribes, presumably the Skokomish could have raised its primary right claim at that time. Nevertheless, in the context of this complex litigation of Indian treaty fishing rights in the Pacific Northwest, which has extended over more than a decade, we do not believe that the Boldt II court's extension of an opportunity to request a full evidentiary hearing in regard to its usual and accustomed fishing place determinations required that the parties also submit their primary right claims.
 
 
 9
 In Nevada, the Court held that res judicata prevented the United States, on behalf of the Pyramid Lake Indian Reservation, from litigating a water rights claim decided in an earlier decree. For its conclusion that the plaintiffs were asserting the same cause of action, the Court looked to both the district court's and the plaintiffs' intention that the earlier litigation be an adjudication of all the rights in the waters in issue: the plaintiffs through the assertions in their complaint, and the court through its decree ("each of them is hereby forever enjoined and restrained from asserting or claiming any rights in or to the waters...."). 463 U.S. at 132, 103 S.Ct. at 2919, 77 L.Ed.2d at 526 (emphasis added by Court).
 
 
 10
 In this case, the Skokomish, in Boldt I, and the Suquamish, in Boldt II, had asserted claims for a determination of only their usual and accustomed fishing places. The court did not hold that further treaty fishing claims were barred, stating only that its specific findings, if not objected to, would become final. Also, the court contemplated the possibility of future primary rights litigation in its statement that it would allow three tribes, including the Suquamish, to bring their claims later if they could not resolve their differences among themselves. Finding 7, 459 F.Supp. at 1049.
 
 
 11
 Additionally, entertaining the primary right claim of the Skokomish is not relitigation of the same cause of action because it would not serve "to sustain or defeat" the court's determination of the usual and accustomed fishing places of the Suquamish. See Nevada, 463 U.S. at 130, 103 S.Ct. at 2918, 77 L.Ed.2d at 524. Stated another way, it would not "partially undo" the earlier decree. Id., 463 U.S. at 113, 103 S.Ct. at 2910, 77 L.Ed.2d at 514. The rights attendant to a determination of the usual and accustomed fishing places of the Suquamish would remain intact. Like many other rights, however, this right is not unlimited in that it may be subject to a superior, in this case, primary, right.
 
 
 12
 Accordingly, we hold that the Skokomish Tribe is not barred by the doctrine of res judicata from asserting its primary right claim.
 
 II. Primary Right
 
 13
 The district court's factual determinations will not be overturned unless clearly erroneous. Fed.R.Civ.P. 52(a). The United States Supreme Court recently reemphasized the great deference given the district court's findings of fact:
 
 
 14
 "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently....
 
 
 15
 This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.
 
 
 16
 Anderson v. Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518, 528 (1985) (citations omitted). The district court's application of law to facts is subject to de novo review. United States v. Washington, 730 F.2d 1314, 1317-18 (9th Cir.1984).
 
 
 17
 The Suquamish Tribe asserts that the district court did not apply the applicable law to the facts. The "law" referred to is the four-part inquiry offered by Dr. Barbara Lane in United States v. Lower Elwha Tribe, 642 F.2d 1141, 1143 n. 4 (9th Cir.), cert. denied, 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 161 (1981), to aid in determining whether a tribe controlled an area. The court in Lower Elwha, however, did not state that these considerations were a rigid formula or test, but rather, indicated they were useful as an analytical tool. In any event, the district court in this case did address these considerations, although it did not expressly refer to them as such.
 
 
 18
 The district court heard testimony from three anthropologists, Drs. Lane and Elmendorf for Skokomish, and Dr. Miller for Suquamish. After discussing their qualifications and research methods, the court concluded that "where there are variances between the conclusions of Drs. Lane and Elmendorf and those of Dr. Miller, the former are more credible and are accepted." Finding of Fact # 348. This court has stated that the findings of a district judge, made in reliance on controverted expert testimony, will not be disturbed unless clearly erroneous. United States v. Alpine Land and Reservoir Co., 697 F.2d 851, 857 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 193, 78 L.Ed.2d 170 (1984).
 
 
 19
 The district court's determination as to the weight to be given to each of the three experts' testimony was not clearly erroneous. Dr. Lane has been extensively relied upon throughout the adjudication of the Pacific Northwest Indian fishing rights. See, e.g., United States v. Washington, 730 F.2d at 1315. Additionally, it is undisputed that Dr. William W. Elmendorf is the acknowledged expert on the Twana, or Skokomish. Although he did not employ the term "primary right," Dr. Elmendorf clearly concluded that the Hood Canal was Twana territory and that the Twana Tribe held the recognized prerogative to exclude others from its territory.
 
 
 20
 The Hood Canal is a long, narrow body of salt water bordered by the Olympic Mountains on the west and the crest of the Kitsap Peninsula on the east. Numerous rivers and streams flow into the canal around its periphery. It is generally distinguishable from the open waters of Puget Sound in that it terminates in a cul-de-sac within a single drainage, while Puget Sound links a number of otherwise separate drainages and provides an avenue of transportation between them.
 
 
 21
 At and before treaty times, the Twana occupied nine winter villages, none of which were located on the east side of the canal. The Suquamish argue that at most, the Twana primary right is limited to the west side of the canal and the southern tip from the Great Bend area to the south and east.
 
 
 22
 The district court found that all areas of the Hood Canal, and the rivers and streams draining into it were easily accessible by canoe to the Twana and were intensively used by and of great importance to them for food-gathering activities. This is supported by the narrow, elongated configuration of the canal, which varies in width from one to four miles.
 
 
 23
 No aboriginal group other than the Twana occupied a village within the Hood Canal drainage area south of the Post Gamble area. Even the Twana name for the Hood Canal was "the Twana's salt water." The court found that the best evidence that the location of the Twana territory was the Hood Canal basin was the description by George Gibbs, a lawyer, ethnographer, and secretary to the 1855 Treaty Commission. His description was corroborated by Drs. Lane, Elmendorf, and Waterman, who all worked independently and at different times. The accuracy of this description and its delineation of the primary right boundary of the Skokomish is bolstered by the court's finding that,
 
 
 24
 [t]he treaty-time Twana and their neighbors, like other aboriginal peoples in western Washington, bounded their territories at divides between drainage basins. This pattern reflected the predominant Indian conception that territories were centered on the water bodies or courses upon which people relied for subsistence. Territory was most clearly defined, and the sense of ownership strongest, along the waters at its center and was generally less sharply defined at the peripheries.
 
 
 25
 Finding of Fact # 355 (citations omitted).
 
 
 26
 The record supports the court's finding that at treaty times, the Twana held the primary fishing right within their territory, and that this right was acknowledged by neighboring tribes. The court found that the Twana and their treaty-time neighbors, including the Suquamish, enjoyed peaceful relations founded on marital, ceremonial and other cultural ties. The customary behavior of treaty-time Indians generally reflected these common understandings through restraint from intrusion on or unauthorized use of others' territories. The court found, however, that the Twana had readily available means of deterring unauthorized use of their territory, such as social disapproval, magical retaliation, and possibly physical force.
 
 
 27
 Suquamish places great emphasis on the testimony of Lawrence Webster who testified that he and approximately ten adult Suquamish, including his grandparents, made three fishing trips to the Hood Canal between 1904 and 1907. The district court, however, found that "the Suquamish Tribe's evidence of fishing activity by Suquamish people in the Hood Canal area around the turn of the 20th Century, even if fully credited, would not support a finding that, at treaty times, the Suquamish Tribe's forebears fished in Twana Territory as other than persons holding secondary rights subject to the Twanas' primary right." Finding of Fact # 356.
 
 
 28
 The district court's holding that the Twana/Skokomish held the primary fishing right in the Hood Canal and its drainage area was based on reliable evidence contemporary with the treaty and extensive post-treaty anthropological research. It, therefore, is not clearly erroneous and, accordingly, is affirmed.
 
 
 29
 The Skokomish Tribe's request for attorneys' fees is denied.
 
 
 30
 AFFIRMED.