**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff,*

and

SKOKOMISH INDIAN TRIBE,
*Plaintiff-Appellant,*

v.

STATE OF WASHINGTON,
*Defendant,*

and

PORT GAMBLE S'KLALLAM TRIBE;
JAMESTOWN S'KLALLAM TRIBE,
*Defendants-Appellees.*

No. 07-35062

D.C. Nos.
CV-70-09213-RSM
SP-05-00002-RSM

8655

United States of America;
Skokomish Indian Tribe,
*Plaintiffs,*

v.

State of Washington,
*Defendant,*

and

Port Gamble S'Klallam Tribe;
Jamestown S'Klallam Tribe,
*Defendants-Appellees,*

v.

Lower Elwha Klallam Tribe,
*Plaintiff-intervenor-Appellant.*

No. 07-35124

D.C. No.
CV-70-09213-RSM

UNITED STATES OF AMERICA;
SKOKOMISH INDIAN TRIBE,
                    *Plaintiffs,*

            and

MAKAH INDIAN TRIBE; PUYALLUP
TRIBE; NISQUALLY INDIAN TRIBE;
LUMMI INDIAN NATION,
            *Intervenors-Appellants,*

            v.

STATE OF WASHINGTON,
                    *Defendant,*

            and

PORT GAMBLE S'KLALLAM TRIBE;
JAMESTOWN S'KLALLAM TRIBE,
            *Defendants-Appellees,*

            v.

SWINOMISH INDIAN TRIBAL
COMMUNITY,
      *Plaintiff-intervenor-Appellant.*

No. 07-35219
D.C. Nos.
CV-70-09213-RSM
SP-05-00002-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
October 21, 2008—Seattle, Washington

Filed July 13, 2009

Before: Diarmuid F. O'Scannlain, Pamela Ann Rymer, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Kleinfeld

## COUNSEL

Douglas B. L. Endreson, Sonosky, Chambers, Sachse, Endreson & Perry, LLP, Washington, D.C., for appellant Skokomish Indian Tribe.

Lori Ellen Nies (briefed), Skokomish Indian Tribe, Skokomish Nation, Washington, for appellant Skokomish Indian Tribe.

Lorane F. Hebert, Hogan & Hartson, LLP, Washtington, D.C., for appellant Lower Elwha Klallam Tribe.

Richard M. Berley, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington, for appellant Makah Tribe.

David West (briefed), Garvey, Schubert & Barer, Seattle, Washington, for appellant Quileute Tribe.

Samuel J. Stiltner (briefed), Law Office of Puyallup Indian Tribe, Tacoma, Washington, for appellant Puyallup Tribe.

Harold Chesnin (briefed), Office of Tribal Attorney Upper Skagit Indian Tribe, Sedro Woolley, Washington, for appellant Upper Skagit Tribe.

Daniel A. Raas (briefed), Raas, Johnsen & Stuen, P.S., Office of Special Counsel, Bellingham, Washington, for appelllant Lummi Nation.

Bill Tobin (briefed), Office of Tribal Attorney Nisqually Indian Tribe, Vashon, Washington, for appellant Nisqually Tribe.

Kevin Lyon (briefed), Office of Tribal Attorney Squaxin Island Indian Tribe, Shelton, Washington, for appellant Squaxin Island Tribe.

Eric Nielsen (briefed), Nielsen, Broman & Koch, Seattle, Washington, for appellant Quinault Indian Nation.

James M. Jannetta (briefed), Swinomish Indian Tribal Community, LaConner, Washington, for appellant Swinomish Indian Tribal Community.

Lauren P. Rasmussen, Law Offices of Lauren P. Rasmussen, PLLC, Seattle, Washington, for appellees.

---

**OPINION**

KLEINFELD, Circuit Judge:

In substance, one Indian tribe seeks against other tribes an equitable apportionment of a shared fishery. Though this case was filed as a proceeding in the still pending 1970 district court case of *United States v. Washington*,[1] neither the United States nor the State of Washington asserts a claim or defends against one.

## I.   Facts.

In the 1850s, the United States signed a series of treaties with the tribes of the Pacific Northwest.[2] These treaties were between the tribes and the United States, and did not purport to settle disputes between different tribes.[3] "The Tribes ceded

---

[1]Complaint, *United States v. Washington*, No. 70-9213, Dkt. No. 1 (W.D. Wash. Sept. 18, 1970).

[2]*See, e.g.*, Treaty of Point No Point (Jan. 26, 1855), 12 Stat. 933 (1859); Treaty of Point Elliot (Jan. 22, 1855), 12 Stat. 927 (1859). *See generally Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661-69 (1979).

[3]*See, e.g.*, Treaty of Point No Point, 12 Stat. at 933 ("Treaty between the United States of America and the S'Klallam Indians"); Treaty of Point Eliott, 12 Stat. at 927 ("Treaty between the United States and the Dwamish, Suquamish and other allied and subordinate Tribes of Indians in Washington Territory").

their aboriginal lands to the United States for settlement, receiving in exchange exclusive title to defined lands, free medical care, schools, occupational training, and annuity payments."[4] What matters for this case is that the treaties also reserved to the tribes the "right of taking fish . . . in common with all citizens of the United States."[5]

In 1970, the United States in *United States v. Washington*[6] sued the state government to enforce the treaties on behalf of the Indians. The complaint sought an injunction to prevent the State of Washington from "enforcing the provisions of state laws or regulations in such manner as to prevent or restrict members of said tribes from taking fish . . . without previously having established that the imposition of state regulation is necessary for the conservation of fish."[7] No injunction was sought against any tribe by any party.

As part of his lengthy and detailed opinions in that (and technically still this) case,[8] Judge Boldt described the treaty fishing right as "a reserved right, which is linked to the marine and freshwater areas where the Indians fished during treaty times, and which exists in part to provide a volume of fish which is sufficient to the fair needs of the tribes."[9] A tribe

---

[4]*United States v. Washington*, 157 F.3d 630, 638 (9th Cir. 1998). For a general overview of the history of the treaties and the ensuing fishing rights litigation, see *id.* at 638-41.

[5]Treaty of Point No Point, 12 Stat. at 934.

[6]*United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974) [hereinafter *Decision I*].

[7]Complaint, *United States v. Washington*, No. 70-9213, Dkt. No. 1, at 12 (W.D. Wash. Sept. 18, 1970).

[8]Judge Boldt's initial decision was over 100 pages long. After that decision, he and other district judges have issued a number of decisions determining the nature and location of specific tribes' reserved fishing rights and related matters. See, e.g., *United States v. Washington*, 459 F. Supp. 1020 (W.D. Wash. 1978) [hereinafter *Decision II*]; *United States v. Washington*, 626 F. Supp. 1405 (W.D. Wash. 1985) [hereinafter *Decision III*].

[9]*Decision I*, 384 F. Supp. at 401 ¶ 20.

has treaty rights at "every fishing location where members of a tribe customarily fished . . . whether or not other tribes then also fished in the same waters."[10] The district court has then and subsequently denoted more than 20 tribes' usual and accustomed fishing grounds.[11] The adjudicated fishing areas of several tribes overlap.

Judge Boldt determined that the treaties entitled the tribes to roughly 50% of the resources within traditional tribal fisheries. The Supreme Court ultimately affirmed this decision.[12] Both the trial court and the Supreme Court disclaimed any responsibility for intertribal allocation of the Indian 50% when the same fishery was shared by multiple tribes. "The court left it to the individual tribes involved to agree among themselves on how best to divide the Indian share of runs that pass through the usual and accustomed grounds of more than one tribe. . . ."[13]

Pursuant to the request of the United States in its initial complaint against the State of Washington,[14] the district court retained jurisdiction over "this case for the life of this decree to take evidence, to make rulings and to issue such orders as may be just and proper upon the facts and law in implementation of this decree."[15] Judge Boldt set forth the grounds for invoking that jurisdiction:

> 25. (a) The parties or any of them may invoke the

---

[10]*Id.* at 332 ¶ 8.

[11]*E.g.*, *id.* at 359-82; *Decision II*, 459 F. Supp. at 1049, 1059-60; *Decision III*, 626 F. Supp. at 1441.

[12]*Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979).

[13]*Id.* at 671; *see Decision I*, 384 F. Supp. at 407 ¶ 17, 410 ¶ 12.

[14]Complaint, *United States v. Washington*, No. 70-9213, Dkt. No. 1, at 14 (W.D. Wash. Sept. 18, 1970).

[15]*Decision I*, 384 F. Supp. at 408 ¶ 24.

continuing jurisdiction of this court in order to determine:

> (1) Whether or not the actions, intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision # I or this injunction; . . .

> (4) Disputes concerning *the subject matter of this case* which the parties have been unable to resolve among themselves; . . . [and]

> (7) Such other matters as the court may deem appropriate.[16]

*Decision I* had previously defined the subject matter of the case as the application of the tribes' treaty rights to anadromous fish in Washington waters.[17]

To invoke the court's continuing jurisdiction, parties must file "requests for determination,"[18] which are functionally the same as a complaint, but get two file numbers, the original 1970 number of the treaty case, and an "SP" number to indicate a new subproceeding within that case. This bit of administrative trivia matters, as we shall see, to jurisdiction over the tribes. After *Decision I*, when requests for determination concerning nonanadromous fish and other matters outside the defined subject matter of the case were filed, the court decided that equity favored the consolidation of "matters

---

[16]*Id.* at 419 ¶ 25, *as technically modified by* Order Modifying Paragraph 25 of Permanent Injunction, *United States v. Washington*, No. 70-9213, Dkt. No. 13599, at 1-2 (W.D. Wash. Aug. 23, 1993) (emphasis added).

[17]*Decision I*, 384 F. Supp. at 400 ¶ 7.

[18]*Id.* at 419 ¶ 25.

related to, but not included within, Final Decision # 1."[19] It thus expanded the subject matter of the case. Later, the district court concluded it had jurisdiction over intertribal allocations.[20]

In 1981, the Skokomish Indian Tribe requested a determination that it had the primary right to fish in the Hood Canal. The claim for a "primary right" in these cases entails "the power to regulate or prohibit fishing by members of other treaty tribes" with fishing rights in the same territory.[21] Primary right adjudication depends on the historical relationship between tribes at the time of the treaties.[22]

Several tribes with pending claims of a right to fish in the Hood Canal objected to Skokomish's claim.[23] Skokomish settled its claims with the Lower Elwha Klallam, Port Gamble S'Klallam, and Jamestown S'Klallam tribes. These 'stipulating parties' entered the Hood Canal Agreement which resolved Skokomish's primary rights claim as well as the territorial claims of Port Gamble and Lower Elwha.[24] The Hood Canal Agreement created a joint fishery north of Ayock Point in the Hood Canal where all of the parties "may exercise their respective treaty fishing rights without any limitation or control whatsoever by any of the stipulating parties, except as the stipulating parties may mutually agree by compact or other-

---

[19]*Decision II*, 459 F. Supp. at 1048.

[20]*Decision III*, 626 F. Supp. at 1470-71 ¶ 4 ("This Court's ruling that the question of intertribal allocation is a matter for the tribes rather than the state to resolve prohibits the state from interfering with intertribal allocation but *in no way limits this Court's jurisdiction* over this or any other matter . . . .") (citations omitted and emphasis added).

[21]*United States v. Skokomish Indian Tribe*, 764 F.2d 670, 671, 674 (9th Cir. 1985) (affirming Skokomish's primary right claim against the Suquamish tribe).

[22]*United States v. Lower Elwha Tribe*, 642 F.2d 1141, 1143 (9th Cir. 1981); *Decision III*, 626 F. Supp. at 1531 ¶ 97.

[23]*See Decision III*, 626 F. Supp. at 1468.

[24]*Id.*

wise. The Skokomish Tribe specifically agrees that it will not
. . . seek to exercise its primary right on Hood Canal north of
Ayock Point . . . ."[25]

After the Hood Canal Agreement, the stipulating parties
managed their joint fishery together through the Point No
Point Treaty Council. They entered into successive Off-
Reservation Fisheries Management Compacts. The 1999
Compact was the last agreement. This scheme for resolution
of disputes among the tribes eventually dissolved. Skokomish
and the Lower Elwha Klallam Tribe withdrew from the Point
No Point Treaty Council in 2003 and 2004, respectively. The
tribes could no longer reach an agreement on the intertribal
allocation of the joint fishery north of Ayock Point.

Skokomish unilaterally issued a harvest plan for 2004-05,
allocating to itself certain percentages of the Indian share.[26]
Port Gamble and Jamestown filed a request for determination
that Skokomish violated the Hood Canal Agreement.[27] Sko-
komish filed a counter-request[28] seeking an equitable alloca-
tion of the joint fishery in order to prevent a 'race fishery'
from interfering with its ability to manage its fishery and meet
tribal needs. Its request acknowledged that it was harvesting
the same amount of fish as before. The district court bifur-
cated the two claims. This appeal concerns Skokomish's
counter-request for an equitable allocation, which Lower
Elwha supported.

The district court granted the Port Gamble and Jamestown
Tribes' motion to dismiss. The district court held that "[t]he
dispute here does not arise from the Hood Canal Agreement,
and it cannot be settled by looking to its terms. Instead, the

---

[25]*Id.* at 1469.

[26]*See United States v. Washington*, 393 F. Supp. 2d 1089, 1092-93
(W.D. Wash. 2005).

[27]*Id.*

[28]Functionally the same as a counterclaim.

Skokomish are asking the court to bypass the Agreement and create an allocation for the parties because they cannot agree among themselves as required by the Agreement." The court noted that nothing in the agreement "empowers the court to allocate harvest shares in the absence of the agreement of the parties." The provision in Judge Boldt's decree retaining jurisdiction for "[d]isputes concerning the subject matter of this case which the parties have been unable to resolve among themselves," did not apply because "[t]he subject matter of this case is treaty fishing rights, not the equitable rights of any one tribe to harvest a certain allocation of fish . . . . Nowhere in these decisions is there a finding that inter-tribal allocation (as opposed to allocation between treaty- and non-treaty fishermen) is the subject matter of this case." As for the catch-all language in Judge Boldt's order, "[s]uch other matters as the court may deem appropriate," "[t]his is a discretionary section, and . . . the Court does not deem it appropriate to take jurisdiction of this matter." Because the request for allocation did not fall within the purposes of enforcing the treaty or the Hood Canal Agreement, and neither provided for court allocation if the tribes could not agree among themselves, the court exercised its discretion to refrain from granting equitable relief. Though we do not reach, or rule upon, all the conclusions of the district court and the challenges to them, we conclude that dismissal was proper, and affirm.

## II.   Analysis.

We may affirm the dismissal on any ground supported by the record.[29] We do so on the ground that the Skokomish Tribe has not pleaded facts that would entitle it to application of the doctrine of equitable apportionment. Because dismissal was proper on this ground, and our precedents compel us to conclude that the district court had jurisdiction,[30] we need not consider the remaining issues.

---

[29]*Aronson v. Resolution Trust Corp.*, 38 F.3d 1110, 1112 (9th Cir. 1994).

[30]*E.g.*, *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1357 (9th Cir. 1998); *United States v. Lower Elwha Tribe*, 642 F.2d 1141, 1143-

**[1]** This claim by one tribe against others to allocate fish is, as the district court said, far afield from the treaty dispute between the United States on behalf of the Indian tribes and the State of Washington in which the underlying decree issued, and is not an interpretation of the Hood Canal Agreement. There is no treaty and no agreement of any kind between the tribes to be construed and applied. The claim is more analogous to a claim for equitable allocation of fish between states, which the Supreme Court confronted in *Idaho ex rel. Evans v. Oregon*.[31] In that case, the State of Idaho sought apportionment of anadromous fish between itself, Oregon, and Washington. The Court held that "the doctrine of equitable apportionment is applicable to this dispute."[32] Such "apportionment is based on broad and flexible equitable concerns rather than on precise legal entitlements."[33]

**[2]** When one state seeks equitable apportionment against another under the doctrine of equitable apportionment, the Court held that it "must prove by clear and convincing evidence some real and substantial injury or damage."[34] In *Idaho ex rel. Evans*, the Court declined to exercise its equitable jurisdiction to make an apportionment, because Idaho had not proved "that Oregon and Washington are now injuring Idaho by overfishing the Columbia or that they will do so in the future."[35] The Court concluded that, "[a]lthough it is possible

44 (9th Cir. 1981), *aff'g Decision II*, 459 F. Supp. at 1066-68 (determining the primary right claims of the Makah and Lower Elwha Klallam Tribes, and stating that if disputes concerning their joint fishery should be referred to the Northwest Indian Fisheries Commission, whose decision "may be reviewed by the court").

[31]462 U.S. 1017 (1983).

[32]*Id.* at 1024.

[33]*Id.* at 1025.

[34]*Id.* at 1027.

[35]*Id.* at 1028; *see also id.* at 1028 n.12 (stating that "the Court must look to factors such as disproportionate reductions in Idaho's normal harvest, or reductions in the total fish in the runs" in order to establish "the need for a decree").

that Washington and Oregon will mismanage this resource in the future, Idaho has not carried its burden of demonstrating a substantial likelihood of injury."[36]

This high burden for pleading and proof differs from ordinary standing doctrine, because suits between sovereigns require restraint by the courts, and because equitable remedies are discretionary. The Supreme Court has long held that "[t]he governing rule is that this Court will not exert its extraordinary power to control the conduct of one State at the suit of another, unless the threatened invasion of rights is of serious magnitude and established by clear and convincing evidence."[37]

[3] Like states, Indian tribes are sovereign entities, albeit, "domestic dependent" sovereigns.[38] We held in *Moore v. Nelson*[39] that, under *Santa Clara Pueblo v. Martinez*,[40] "[t]he same considerations of federal non-interference in the affairs of other sovereigns that influenced us in *Edmunds* [to limit habeas review of state convictions] apply to our review of the actions of Indian tribes."[41]

[4] The district court properly dismissed the Skokomish tribe's claim for equitable apportionment, because even accepting that the tribe could prove what it pleaded, that would not "prove by clear and convincing evidence some real and substantial injury or damage." The Skokomish tribe pleaded that "[f]rom 1976 *through the present*, Skokomish has and *continues* to harvest up to 90% of certain species of the Hood Canal finfish fishery . . . . [and] up to 80% of certain

---

[36]*Id.* at 1029.

[37]*Connecticut v. Massachusetts*, 282 U.S. 660, 669 (1931).

[38]*Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831).

[39]270 F.3d 789, 791 (9th Cir. 2001).

[40]436 U.S. 49, 62-63 (1978).

[41]*Moore*, 270 F.3d at 791 (discussing *Edmunds v. Won Bae Chang*, 509 F.2d 39, 41 (9th Cir. 1975)); *see also Solomon v. Interior Regional Hous. Auth.*, 313 F.3d 1194, 1200 (9th Cir. 2002).

species of shellfish." The tribe does not plead any impingement on its ability to obtain whatever fish it claims under the treaty. All it alleges is that if the court does not make an equitable allocation, its "share will remain uncertain" and other tribes with greater rights in other areas may at some time impinge on Skokomish's fishery.

[5] Intertribal allocations of the fisheries have historically been a matter for the tribes to resolve amongst themselves, as sovereigns.[42] The Hood Canal Agreement was just such an act. For that reason, both the trial court and the Supreme Court in this case disclaimed any responsibility for allocating the tribal portion of fisheries shared by multiple tribes.[43] Assuming that our precedents are correct in holding that the district court has jurisdiction to make these allocations, it nevertheless retains its discretion under the equitable allocation doctrine to decline to do so. As in the *Idaho ex rel. Evans* case, nothing has happened to the Skokomish that would justify the exercise of jurisdiction in the face of the high fence the Court has erected against its exercise.[44] The Skokomish tribe pleads no "real and substantial injury or damage." And Skokomish pleads that it is taking as much fish now as in the past.

The Skokomish Tribe has argued that if it cannot obtain allocations from the district court, then there may be a race for the fish among the tribes, and there will be no way to regulate the race. The need for equitable allocation in this case, it

---

[42]*See, e.g.*, *United States v. Lower Elwha Tribe*. 642 F.2d 1141, 1143-44 & n.4 (9th Cir. 1981); *Decision III*, 626 F. Supp. at 1490-91 ¶¶ 355-57, 1528 ¶¶ 362-67.

[43]*See Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. at 671; Decision I, 384 F. Supp. at 407 ¶ 17, 410 ¶ 12. *But see Decision III*, 626 F. Supp. at 1470-71 ¶ 4.

[44]*See Idaho ex rel. Evans*, 462 U.S. at 1028 n.12 (stating that "the Court must look to factors such as disproportionate reductions in Idaho's normal harvest, or reductions in the total fish in the runs" in order to establish "the need for a decree")

argues, arises from the sovereign immunity of the tribes. Were it to file a new lawsuit, instead of hanging onto the coattails of the 1970 case enforcing the tribes' treaty rights against the State of Washington, then, Skokomish argues, any tribe it sued could assert its sovereign immunity against suit. That may be so. But not all problems have judicial solutions. And for disputes among Indian tribes, there is something to be said for a private dispute resolution procedure among themselves, such as the Point No Point Treaty Council or the Northwest Indian Fisheries Commission, because of their greater familiarity with and sensitivity to the details of the problem and any cultural factors that may bear on the solution, if there is one.[45]

We are puzzled, but need not reach the question, about why the equitable decree in this case remains in force at all. The point of the lawsuit the United States filed was to protect Indian treaty rights from state infringement, not to sort out competing tribal claims. That goal was achieved,[46] and has nothing to do with the continuing exercise of jurisdiction as far as we can tell from the record. The goal of "provid[ing] a volume of fish sufficient to the fair needs of the tribes"[47] seems similarly to have been achieved, as this dispute demonstrates.[48]

---

[45]*Cf. Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59, 72 (1978) (expressing the need for caution before subjecting disputes arising between Indians to a federal forum).

[46]*See Puget Sound Gillnetters Ass'n v. Moos*, 603 P.2d 819, 822-824 (Wash. 1979) (overruling past Washington Supreme Court decisions which had precluded Washington agencies' attempts at compliance with the decree, and recognizing that the agencies have the authority to manage the fishery in a manner that gives full force and effect to the treaty rights of the Indians).

[47]*Decision I*, 384 F. Supp. at 401 ¶ 20.

[48]*See also* Wash. Dep't of Fish & Wildlife, *2008-9 Co-Managers' List of Agreed Fisheries*, http://wdfw.wa.gov/fish/tribal/2008-09agreement.pdf (Apr. 17, 2008) (describing allocation of fisheries for the 2008-09 harvest).

The original injunction, entered 35 years ago, was intended to resolve the treaty right fishing disputes once and for all.[49] Yet this case has become a Jarndyce and Jarndyce, with judges dying out of it and whole Indian tribes being born into it.[50] The district court accurately stated fifteen years ago that "the court has become a regulatory agency perpetually to manage fishing." Judges in the Western District of Washington have now been regulating fishing in the Puget Sound for 35 years, with the aid of a Fishery Advisory Board that the court created.[51] The Constitution does not establish the district courts as permanent administrative agencies.

[6] Now that treaty enforcement is no longer at issue, it is hard to see why the court still displaces state and federal fish management agencies. As the Supreme Court held in *Frew v. Hawkins*, "[t]he federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is promptly returned to the State and its officials."[52] The Court

---

[49]*See Decision I*, 384 F. Supp. at 330 ("The ultimate objective of this decision is to determine every issue of fact and law presented and, at long last, thereby finally settle, either in this decision or on appeal thereof, as many as possible of the divisive problems of treaty right fishing which for so long have plagued all the citizens of this area, and still do.").

[50]*See United States v. Washington*, 394 F.3d 1152 (9th Cir. 2005) (allowing the Samish tribe to reopen previous proceedings finding that it lacked a treaty right due to its federal recognition as a tribe); Charles Dickens, *Bleak House* 3 (1853) ("Jarndyce and Jarndyce drones on. This scarecrow of a suit has, in course of time, become so complicated, that no man alive knows what it means. The parties to it understand it least; but it has been observed that no two Chancery lawyers can talk about it for five minutes, without coming to a total disagreement as to all the premises. Innumerable children have been born into the cause; innumerable young people have married into it; innumerable old people have died out of it."). *Compare McDonnell Douglas Corp. v. United States*, No. 2007-5111, 2009 WL 1515777, at *1 (Fed. Cir. June 2, 2009) (calling an 18 year old case an "American version of *Jarndyce and Jarndyce*").

[51]*See Decision II*, 459 F. Supp. at 1061-63.

[52]*Frew v. Hawkins*, 540 U.S. 431, 442 (2004); *see also Labor/Cmty. Strategy Ctr. v. L.A. County Metro. Transp. Auth.*, 564 F.3d 1115, 1123

has repeatedly reminded us that institutional reform injunctions were meant to be temporary solutions, not permanent interventions, and could be kept in place only so long as the violation continued.[53] Most recently, the Court stated this term that "[i]f a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper."[54] No one alleges that the State of Washington's violations of the Indian tribes' treaty rights continue.

In *Freeman v. Pitts*, the Court listed several factors to consider in determining whether to modify, withdraw supervision over, or terminate ancient equitable decrees: "whether there has been full and satisfactory compliance with the decree . . . ; whether retention of judicial control is necessary or practicable . . .; and whether the [defendant] has demonstrated . . . its good-faith commitment to the whole of the court's decree and to those provisions of the law . . . that were the predicate for judicial intervention in the first instance."[55] *Horne v. Flores*, *Rufo v. Inmates of Suffolk County Jail*, and *Board of Education of Oklahoma City Public Schools v. Dowell* all held that a district court must consider whether the purpose of the decree has been substantially achieved and whether the public interest favors modification or termination.[56]

---

(9th Cir. 2009) ("Our decision is consistent with the principle that federal court intervention in state institutions is a temporary measure and may extend no longer than necessary to cure constitutional violations . . . . In this case, as the district court found, perhaps every last wish and hope of the decree was not achieved, but the decree accomplished its essential purposes and the situation improved greatly.") (citations omitted).

[53]*Frew*, 540 U.S. at 442; *Missouri v. Jenkins*, 515 U.S. 70, 87-89, 102 (1995); *Freeman v. Pitts*, 503 U.S. 467, 489-92 (1992); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380-93 (1992); *Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*, 498 U.S. 237, 247-48 (1991).

[54]*Horne v. Flores*, No. 08-289, slip op. at 13 (U.S. June 25, 2009).

[55]*Freeman*, 503 U.S. at 491.

[56]*Horne*, No. 08-289, slip op. at 13, *Rufo*, 502 U.S. at 381, 384, 387, 392; *Dowell*, 498 U.S. at 247-49.

It is hard to see what we achieve in our continuing adjudications. We pretend to be able to read the mind of the long deceased district judge who initially issued the decree on matters of which he did not speak. And we pretend to determine what the Indian tribes did 150 years ago at a time for which there is no evidence of especially high reliability and little evidence of any kind.[57] This exercise is not law, and is not a reliable way to find facts, so it is hard to see why courts are doing it and how it could be preferable to the Indian tribes working some dispute resolution system out for themselves.

**[7]** We need not in this case decide whether the 1974 decree should now be released, modified, or dissolved, because no party has asked us to. Such a motion, if made, would be directed to the discretion of the district court, as would sua sponte consideration.[58]

## III. Conclusion.

We AFFIRM the dismissal of the request for determination because Skokomish did not plead "real and substantial injury or damage" as required for equitable allocation between sovereigns.

---

[57]*E.g.*, *United States v. Lummi Indian Tribe*, 235 F.3d 443 (9th Cir. 2000); *United States v. Muckleshoot Indian Tribe*, 235 F.3d 429 (9th Cir. 2000); *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (9th Cir. 1998); *United States v. Skokomish Indian Tribe*, 764 F.2d 670 (9th Cir. 1985); *United States v. Lower Elwha Tribe*, 642 F.2d 1141 (9th Cir. 1981). *See Decision II*, 459 F. Supp. at 1059 ("In determining usual and accustomed fishing places the court cannot follow stringent proof standards because to do so would likely preclude a finding of any such areas. Little documentation of Indian fishing locations in and around 1855 exists today.").

[58]*See Lapin v. Shulton, Inc.*, 333 F.2d 169, 170-72 (9th Cir. 1964).