**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**January 23, 2018**

**FOR THE TENTH CIRCUIT**
_____

WALTER STEPHEN JACKSON, by his
parents and next friends, Walter and Helen
Jackson; STEVE NUNEZ, by his guardian
and next friend, ARC of New Mexico;
MARY KATHERINE NOWAK, by her
next friend, James W. Ellis, Esquire;
RICHARD STANFIELD, by his father and
next friend, The Reverend Clyde Stanfield;
BETTY YOUNG, by her next friend, Mary
Dudley, Ph.D.; KELLY VAN CUREN, by
her parents and next friends, Ted and Sallie
Van Curen, on behalf of themselves and all
others similarly situated,

     Plaintiffs - Appellees,

and

ARC OF NEW MEXICO; AVA PEETS,

     Plaintiffs Intervenors - Appellees,

v.

LOS LUNAS COMMUNITY PROGRAM;
NEW MEXICO DEPARTMENT OF
HEALTH; LYNN GALLAGHER, in her
official capacity as Secretary of the New
Mexico Department of Health; JILL
MARSHALL, in her official capacity as
Administrator for the Los Lunas
Community Program; NEW MEXICO
HUMAN SERVICES DEPARTMENT;
BRENT EARNEST, in his official capacity
as Secretary of the New Mexico Human
Services Department; NEW MEXICO

No. 16-2172

PUBLIC EDUCATION DEPARTMENT;
JOE D. CORDOVA, in his official
capacity as Director of the New Mexico
Vocational Rehabilitation Division,

Defendants - Appellants.

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:87-CV-00839-JAP-KBM)**

_____

Jerry A. Walz (James J. Grubel appeared with him on the briefs), Walz and Associates, P.C., Albuquerque, New Mexico, for Defendants - Appellants.

Steven J. Schwartz, Center for Public Representation, Northampton, Massachusetts (Cathy Costanzo, Center for Public Representation, Northampton, Massachusetts; Peter Cubra, Albuquerque, New Mexico; Philip Davis, Albuquerque, New Mexico; Ann Sims, Los Lunas, New Mexico; Tim Gardner and Nancy Koenigsberg, Disability Rights New Mexico, Albuquerque, New Mexico, appeared with him on the briefs), for Plaintiffs - Appellees.

_____

Before **MATHESON**, **McKAY**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

This civil rights class action lawsuit was filed thirty years ago to challenge various aspects of the institutionalization of developmentally disabled individuals at two state-supported facilities in New Mexico. After a lengthy trial in 1990, the district court ruled that Defendants—the two institutions and the individuals charged with their operation—were violating class members' federal constitutional and statutory rights. The district court ordered the parties to develop a plan to cure the

2

violations, and the plan was implemented over the ensuing years through several consent decrees and other court-approved agreements (collectively, consent decrees). Although the two institutions closed in the 1990s, the district court has continued to monitor whether Defendants are in compliance with the obligations set forth in those consent decrees (decree obligations). And in the twenty-five years since the court's initial ruling, the parties have agreed to, and the court has approved, numerous additional decree obligations of varying specificity with which Defendants must comply before the court will discontinue its oversight. As of the district court's most recent order, Defendants had yet to fulfill over 300 decree obligations.

In August 2015, Defendants moved under Federal Rule of Civil Procedure 60(b)(5) to vacate all consent decrees and to terminate the court's oversight, arguing that changed factual circumstances warrant the requested relief. The district court denied the motion in June 2016. Defendants appealed. We vacate the 2016 Order and remand for the district court to decide whether Defendants are currently violating class members' federal constitutional or statutory rights and to reassess the equity of continuing federal oversight with the benefit of that determination.

## I. BACKGROUND

To provide context for this dispute, we begin with an overview of the procedural history of this multi-decade litigation. We then examine the district court's ruling on Defendants' Rule 60(b)(5) motion under the governing legal standard.

3

### A. *Litigation History*

In July 1987, twenty-one developmentally disabled individuals brought this class action lawsuit on behalf of themselves and others similarly situated. In their complaint, Plaintiffs challenged the conditions of institutionalization at Fort Stanton Hospital and Training School (Fort Stanton) and Los Lunas Hospital and Training School (Los Lunas), both of which were state-supported institutions for the developmentally disabled in New Mexico. *Jackson v. Fort Stanton Hosp. & Training Sch.* (*Jackson II*), 964 F.2d 980, 985 (10th Cir. 1992). Plaintiffs sought to correct the federal constitutional and statutory deficiencies of the conditions at Fort Stanton and Los Lunas. *Id.* They also requested relief permitting developmentally disabled persons residing at the institutions to live in integrated family-like settings within the community. *Id.*

In June 1988, the district court allowed more than 125 parents and guardians of residents at Fort Stanton and Los Lunas to intervene. *Id.* Like Plaintiffs, Intervenors sought to bring the conditions at the two institutions into compliance with federal constitutional and statutory law. *Id.* But Intervenors opposed Plaintiffs' efforts to require mandatory transfer of the institutions' residents to community-based facilities. *Id.*

In June 1989, the district court certified a class of "all persons who at that time resided at [Fort Stanton] or [Los Lunas], all persons who would become residents of the institutions during the pendency of the action, and all persons who had been transferred from these two institutions to other facilities funded by [D]efendants." *Id.*

4

## 1. The 1990 Order

After a prolonged trial, the district court issued, on December 28, 1990, an extensive Memorandum Opinion and Order (1990 Order). *Jackson v. Fort Stanton Hosp. & Training Sch.* (*Jackson I*), 757 F. Supp. 1243 (D.N.M. 1990), *rev'd in part*, 964 F.2d 980 (10th Cir. 1992). In the 1990 Order, the court "made detailed findings of fact regarding almost every aspect of the conditions" at the two institutions, *Jackson II*, 964 F.2d at 986, and determined that the conditions were statutorily and constitutionally deficient in eighteen areas, *Jackson I*, 757 F. Supp. at 1315–16.[1] The court concluded that Defendants were discriminating against class members in violation of § 504 of the Rehabilitation Act of 1973 by failing to provide adequate accommodations for severely handicapped residents capable of residing in a community setting, while simultaneously serving less severely handicapped individuals in the community. *See id.* at 1297–99; *see also* 29 U.S.C. § 794. And the court ruled that Defendants were violating class members' substantive due process rights under the Fourteenth Amendment and *Youngberg v. Romeo*, 457 U.S. 307 (1982). *See Jackson I*, 757 F. Supp. at 1305–13. Specifically, the court ruled that

---

[1] The eighteen areas of deficiencies are: (1) individual program plans; (2) medical records; (3) discharge plans; (4) data collection; (5) qualified mental retardation professional services; (6) behavior management; (7) use of physical restraints; (8) prevention of abuse of residents; (9) reduction of accidents and injuries to residents; (10) reports of abuse, accidents, and injuries; (11) staff supervision; (12) preservice training of staff; (13) in-service training of staff; (14) sufficiency of professional staff; (15) adaptive equipment; (16) functional and chronologically age appropriate programming; (17) coordination between residential areas and training program areas; and (18) inadequate space in training program areas. *Jackson v. Fort Stanton Hosp. & Training Sch.*, 757 F. Supp. 1243, 1316–17 (D.N.M. 1990).

Defendants were violating due process by failing to provide residents of the two institutions with minimally adequate medical care; by failing "to provide reasonable conditions of safety for the residents"; by physically restraining residents as a result of understaffing; by failing to provide "minimally adequate training" to the residents; and by failing to implement recommendations by interdisciplinary treatment teams (Teams)—consisting of qualified professionals—that certain of these residents should be placed in community settings. *Id.* at 1306–07, 1312.[2]

The district court ordered the parties to work together in good faith "to formulate by agreement a plan to correct" the eighteen areas of deficiencies at the two institutions. *Id.* at 1315. The court required the parties to formulate a "detailed written policy to be adopted by and followed at each institution," to designate persons responsible at each institution for implementing the correction plans, to describe the "strategies to be adopted by each institution" in order to ensure successful implementation of the correction plans, and to develop a "detailed timetable establishing deadlines by which specific components of the correction plan

---

[2] The district court further concluded that Defendants violated class members' substantive due process rights by "considering the present availability of community services when determining whether to recommend the residents for community placement." *Jackson v. Fort Stanton Hosp. & Training Sch.* (*Jackson II*), 964 F.2d 980, 986 (10th Cir. 1992). Accordingly, the district court permanently enjoined Defendants "from permitting [Teams] to take into account the availability or lack of availability of community services in reaching a recommendation as to whether a resident should be served in the community." *Id.* On appeal, we reversed this portion of the 1990 Order, holding that the district court erred in ruling that due process required Defendants be enjoined from permitting Teams to consider the availability of community services when making treatment decisions. *Id.* at 992.

for each deficiency will be achieved." *Id.* at 1316. The court also set September 10, 1991, as the deadline for "complete correction of all deficiencies." *Id.* And the court required the parties to describe the "[m]eans of assuring continued compliance with appropriate standards after correction of the deficiencies has been achieved." *Id.*

The court further ordered Defendants to prepare, by March 1, 1991, "a written plan of transfer to an appropriate community setting for each resident whose [Team] has recommended placement in a community setting." *Id.* at 1317. The court urged Plaintiffs to confer in good faith with Defendants to resolve any concerns Plaintiffs may have with the proposed plans and to amend the plans accordingly. *Id.* at 1316–17. The court also afforded Plaintiffs the opportunity to "file with the court and serve on [D]efendants a statement of any remaining objections they may have to, and their proposals for amending, any particular plan." *Id.*

Over the next several years, the district court entered various remedial orders and continued to oversee enforcement of those orders.[3] *See Jackson v. Los Lunas Ctr.* (*Jackson III*), No. CIV 87-839-JAP/KBM, 2016 WL 9777237, at *2 (D.N.M. June 14, 2016).

_____

[3] In late 1993, Plaintiffs moved to amend their complaint by interlineation to assert a claim under the Americans with Disabilities Act (ADA). Plaintiffs' proposed claim asserted that Defendants violated the ADA by excluding class members with disabilities from certain public programs and places of public accommodation and service and by segregating class members from their communities by congregating them in Fort Stanton and Los Lunas. In early 1994, the court granted Plaintiffs' motion.

7

**2.     The 1994 Stipulation Concerning Fort Stanton**

In 1994, New Mexico elected to close Fort Stanton by 1995 and to transfer all of the residents at the institution to community-based services. In April 1994, the parties filed a joint motion under Rule 60(b) and *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), to modify portions of the district court's 1990 Order, and to terminate the 1990 Order's requirements as to Fort Stanton upon closure of that facility.

The district court found the parties' joint motion "well-taken" and determined that "the proposed modification is consistent with the rights of the classmembers." JA Vol. 3 at 582. As a result, the court relieved Defendants from making further improvements to Fort Stanton. In doing so, the court stated, "[i]n the event that all classmembers have been transferred from Fort Stanton to appropriate settings by July 31, 1995, this Order and all portions of the [1990 Order] concerning corrections of deficiencies . . . at Fort Stanton will hereby be terminated." *Id.* at 584.

**3.     The 1997 Joint Stipulation on Disengagement (JSD) and Plan of Action**

In October 1997, the parties presented the court with the JSD, a Plan of Action, and a joint motion requesting the court's approval of the JSD. According to the parties' stipulation, the JSD "does not seek a remedy for past violations of Plaintiffs' constitutional and statutory rights." JA Vol. 7 at 1403. It is instead designed to prevent future harm by ensuring that "Plaintiffs' rights are not violated in the community settings." *Id.* at 1394. To that end, the JSD "defines the further actions and requirements" that Defendants had to complete, "and the services,

supports, and benefits" that Defendants had to provide to class members, in order for Defendants to comply with their obligations under the court's existing orders. JA Vol. 4 at 622.

The JSD acknowledges Defendants' "substantial efforts to develop a non-discriminatory service system for persons with developmental disabilities and to provide appropriate community living arrangements and supports to classmembers." *Id.* at 620. And it states Defendants had made "efforts to reasonably accommodate the residents of Fort Stanton and Los Lunas in community settings." *Id.* at 621. As a result of those efforts, Fort Stanton closed in March 1995 when all its residents had transitioned to community settings, and Los Lunas closed in July 1997 when its last resident transitioned to the community.

The JSD also includes a process for judicial disengagement of Defendants' decree obligations. And it identifies the "Continued Improvement of Community Services" as an area subject to disengagement. The Continuous Improvement obligations address "a quality improvement approach that requires Defendants to achieve a certain score on an annual audit." *Jackson III*, 2016 WL 9777237, at *2 (internal quotation marks omitted). In the order denying Defendants' Rule 60(b)(5) motion that is the subject of this appeal, the district court recognized that Defendants have achieved disengagement from fifty-six of the seventy Continuous Improvement obligations. *Id.*

The parties identified additional obligations in the Plan of Action, which Defendant Department of Health developed "to [e]nhance the Community Service

9

System" for persons with developmental disabilities. JA Vol. 4 at 629. The Plan of Action contains "a narrative, desired outcomes, and specific activities for thirteen components of the community service system."[4] *Id.* Those thirteen components are contained in the Plan of Action's thirteen attached appendices. Two more appendices were later added by consent of the parties.

After holding a fairness hearing, the district court issued, in December 1997, an order approving the JSD and the Plan of Action. The court noted the JSD "does not call for immediate dismissal of this lawsuit," but instead "contemplates continued judicial oversight that could extend well into the next [millennium]." *Id.* at 801. The court further observed that the JSD "states the parties' intention to fulfill most of the activities described in the Plan of Action by December 31, 1998, but makes an exception for certain requirements that may not be met until December 31, 2000." *Id.*

**4.      The 2005 Stipulation to Resolve Motion for Noncompliance (Appendix A)**

In May 2004, Plaintiffs moved for an order to show cause and for further remedial relief to require Defendants to comply with the court's December 1997 order approving the JSD and the Plan of Action. In June 2004, Plaintiffs moved for an Order to Reengage Effective Case Management, Desired Outcome A, Under the Plan of Action.

---

[4] The thirteen components are (1) quality enhancement, (2) community incident management system, (3) training, (4) management information systems, (5) individual service planning, (6) case management, (7) behavioral services, (8) crisis response, (9) sexuality, (10) supported employment, (11) assistive technology, (12) medical services, and (13) regional offices.

10

In May 2005, the parties filed a Joint Stipulation on Agreed Actions to Comply with Joint Stipulation of Disengagement and Plan of Action and to Resolve Pending Motions to Show Cause and to Re-engage (2005 Stipulation). Attached to the 2005 Stipulation is "Appendix A[:] Agreed Actions to Address Contempt Motions" (Appendix A). JA Vol. 10 at 1903. The 2005 Stipulation states that it "is intended to obligate Defendants to take certain actions outside the Plan of Action as more specifically outlined in Appendix A." *Id.* at 1898. "[T]he actions identified in Appendix A are intended to facilitate compliance with the JSD, to promote completion of . . . Audit Recommendations, to further address Case Management even though Plan of Action Desired Outcomes related to Case Management have been previously disengaged by an order of the Court and to address certain aspects of Vocational Rehabilitation." *Id.* at 1898–99. The 2005 Stipulation clarifies that it is not intended to change or modify the terms of the JSD, which remain in effect. And it further states that Defendants "agree to implement all of the actions identified and listed in Appendix A," and that the parties agree some of the Appendix A actions supplanted or modified activities listed in the Plan of Action. *Id.* at 1899.

Appendix A imposes 107 specific obligations on Defendants. Some of the obligations are identified as "complete," while many obligations were scheduled to be completed by May 2006 or in 2007. Although those deadlines were not met, Defendants represent that one third of the activities in Appendix A have been disengaged. *Jackson III*, 2016 WL 9777237, at *4.

11

The district court issued an order adopting the parties' stipulation the same day the parties submitted it.

**5.    The 2012 Order**

In mid-July 2010, Plaintiffs filed another Motion for Further Remedial Relief to Remedy Noncompliance. After full briefing, the district court denied the motion without prejudice so Plaintiffs could refile after an evidentiary hearing scheduled for June 2011.

On April 26, 2011—the day before the pretrial conference for the evidentiary hearing—Defendants filed a Rule 60(b)(5) motion to terminate all remaining orders and to conclude the court's oversight. Defendants maintained that they have made more than a reasonable effort to comply with the court's orders, that they have substantially complied with all existing orders, and that changed factual conditions make continuing compliance substantially more onerous. The court held the motion in abeyance and suspended briefing on it until the completion of the evidentiary hearing, which occurred from June 13 to June 17, 2011. *Jackson III*, 2016 WL 9777237, at *4. The court later terminated the pending Rule 60(b)(5) motion without deciding its merits. *Id.* at *4 n.12.

In November 2011, after the evidentiary hearing, Plaintiffs filed a Renewed Motion for Further Remedial Relief to Remedy Noncompliance. Plaintiffs argued that Defendants had failed to comply with the JSD, the Plan of Action, Appendix A, the Rehabilitation Act, and the ADA (collectively, decrees). Plaintiffs also asked the court to appoint a *Jackson* Compliance Administrator (Compliance Administrator) to

12

oversee and ensure Defendants' compliance. In October 2012, the district court issued a 206-page, Findings of Fact and Conclusions of Law (2012 Order). The court praised Defendants' "innovations and progress," but determined that Defendants were still in substantial noncompliance with the decree obligations. JA Vol. 25 at 5303. Indeed, the court identified instances of noncompliance in the areas of health, safety, and supported employment.

Based on the evidence before it, however, the court stated it "is unable to conclude that Defendants have violated the Rehabilitation Act and ADA." The court explained:

> To start with, the Court could not conclude that Defendants have discriminated against severely disabled class members with respect to the provision of health care services. In fact, the Court commends Defendants for accommodating those severely disabled class members who live in rural New Mexico by providing them meaningful access to health care services . . . and for developing more and better health care services directed to severely disabled persons. There is, however, a question as to whether Defendants violated the Rehabilitation Act and ADA by intentionally denying severely disabled class members supported employment services equivalent to those received by less severely disabled persons. Unfortunately, that question of disparate treatment cannot be analyzed at this time, but must be further briefed. On the other hand, the Court was unable to find a violation of the Rehabilitation Act and ADA when severely disabled class members choose to participate in segregated, congregate day services while less severely disabled persons more often chose to engage in supported employment.

*Id.* at 5304–05.

The court also noted that Defendants "are close to substantially complying with [their] obligations," and suggested that "the parties reconsider the descriptions of the more broadly stated obligations and restate them in language that makes the

13

obligations achievable." *Id.* at 5303–04. After all, "many of the obligations are described in language that is more aspirational in nature than operational." *Id.* at 5304. Finally, the court granted Plaintiffs' request to appoint a Compliance Administrator, who could "prod Defendants into final substantial compliance."[5] *Id.* at 5305.

**6.     The 2015 Revised Table IV**

After the district court issued its 2012 Order, the parties were to develop a consolidated remedial plan in the areas of health, safety, and supported employment to address the identified violations. *See Jackson III*, 2016 WL 9777237, at *6. The parties, counsel, the Compliance Administrator, and the court then worked together for over two years before finalizing a consolidated plan. *Id.*

In June 2015, the parties jointly filed the 2015 Revised Table IV—which is a final list of objectives in the areas of health, safety, and supported employment— along with evaluative components (or disengagement criteria) and projected completion dates for each objective. In November 2015, the parties jointly filed a Stipulated Agreement on Disengagement Process for Revised Table IV. Under the

---

[5] After the court issued its 2012 Order, Plaintiffs moved to modify the 2012 Order with respect to their claims under the Rehabilitation Act and the ADA. Plaintiffs asked the court to delete its findings and conclusions "on all discrimination claims regarding severity of disability and segregation," to strike those portions of their November 2011 Renewed Motion for Remedial Relief to Remedy Noncompliance based on the Rehabilitation Act and the ADA, and to vacate the pertinent sections from its 2012 Order. JA Vol. 25 at 5308–09. The court denied the motion to modify, but, on its own initiative, granted Plaintiffs leave to file a motion seeking relief on their disparate treatment claim. Plaintiffs never filed a motion seeking relief on that claim.

14

agreed-upon disengagement process, Defendants would submit a request for disengagement of a specific decree objective to the Compliance Administrator, who would then make a written "determination" on whether the disengagement criteria had been met. If the Compliance Administrator did not agree that the criteria had been met, then Defendants could withdraw their request for a determination or pursue a disengagement motion with the court.

The court noted that, as of May 2016, the Compliance Administrator had issued approximately three determinations on Defendants' requests, with roughly 197 decree obligations remaining for which the Compliance Administrator had not issued preliminary determinations. *Jackson III*, 2016 WL 9777237, at *7 n.20. The court also stated Revised Table IV did not replace or modify existing decree obligations that were not the subject of Plaintiffs' Renewed Noncompliance Motion and the court's 2012 Order. *Id.* at *8. Thus, Defendants must demonstrate substantial compliance with the earlier outstanding decree obligations, in addition to those listed in Revised Table IV. *Id.* The court estimated that, between the JSD, the Plan of Action, Appendix A, and Revised Table IV, Defendants must still show substantial compliance with approximately 307 decree obligations. *Id.* at *9.

### B. *District Court's Denial of Defendants' Rule 60(b)(5) Motion*

In August 2015, Defendants filed their current motion under Rule 60(b)(5), arguing that factual circumstances have changed to the extent that the district court should vacate all remaining orders and conclude its oversight entirely. Defendants identified four changed factual circumstances they claim warrant vacatur of all

15

pertinent decrees and termination of the case. First, Defendants argued that their decree obligations have increased in number and complexity to the point they will never be able to satisfy the "labyrinth of obligations" that are ever-changing, ever-increasing, and not subject to objective measurement. *Jackson III*, 2016 WL 9777237, at \*11.

> Second, Defendants argued that some of their obligations are now outdated:

> 1) the JSD provisions about community practice improvements at [Los Lunas], which are no longer relevant as that institution closed in 1997; 2) the JSD formulate for disengagement of the Continuous Improvement outcomes, which is "convoluted," "confusing," and "unworkable"; 3) the JSD Continuous Improvement obligations that "are no longer programmatically sound and are no longer the desire" of [class members]," and that are not relevant to the present-day needs of [class members]; 4) the 1997 Plan of Action obligations that have been "morphed into new requirements" under Revised Table IV and that are "long detached from remedying the original constitutional issues"; and 5) Appendix A obligations that consist of vague and aspirational language, making disengagement impossible.

*Id.* at \*12 (citations omitted).

Third, while conceding they have not substantially complied with all their decree obligations, Defendants maintained they have remedied all constitutional violations. *Id.* They argued they have thus attained the "objects" of the consent decrees, and they have corrected all eighteen areas of deficiencies the district court identified in its 1990 Order. *Id.* at 12–13. And if more is required, they insisted, this case will remain a never-ending process of continuing quality control. *Id.* at 12.

Fourth, Defendants argued that the increased litigation costs inhibit New Mexico's ability to fund other important programs. *Id.* at \*12–13. For instance, New

16

Mexico has spent more than $50 million related to this litigation in the last eight years. *Id.* at \*12. And, as of 2009, the average yearly cost to provide services to class members had risen from $67,290.00 to $135,535.00 per class member, while New Mexico's $32,992.00 per capita income was the ninth lowest in the United States. *Id.* at \*13.

Based on these four changed circumstances, Defendants contended that notions of federalism supported their request for relief. Indeed, they argued that federalism concerns are heightened here because the consent decrees have the effect of dictating state and local budget priorities and improperly depriving state officials of their designated legislative and executive powers. *Id.* at \*13.

In an order issued in June 2016, the court ruled that Defendants had not met their burden to show the existence of a significant change in fact warranting vacatur of all pertinent orders and termination of the case. First, the court stated that "while Defendants' obligations are onerous," Defendants never identified when these asserted changed factual circumstances occurred; indeed, "[s]ome of the complained about developments have been happening for years." *Id.* at \*14.

Next, the court concluded that Defendants have not shown that the objects of the pertinent decrees have been attained. While the court recognized that the decrees were designed to restore class members to the position they would have occupied absent violations of federal law, the court stated that the "more specific 'essential purposes'" of those decrees "are to provide class members with adequate health care, a reasonably safe environment, and supported employment opportunities." *Id.*

17

(quoting 2012 Order at 33). And based on Defendants' concessions that they have not substantially complied with all the decree obligations, the court concluded that Defendants "have not fulfilled the essential purposes of the pertinent decrees." *Id.*

Further, the court found Defendants' assertion that they long ago remedied all constitutional violations to be "somewhat misleading." *Id.* at *14–15. The court explained that the decree obligations in the JSD, the Plan of Action, and Appendix A "all flowed from [its] original findings of [federal] violations in 1990." *Id.* at *15. And it noted that Revised Table IV was developed in response to the 2012 findings of approximately 100 decree violations. *Id.* The court stated that it "correlated its specific findings of violations in 2012 with enumerated requirements in the JSD, Plan of Action, and Appendix A." *Id.* "Stated differently, the October 2012 violations evolved from compliance issues concerning obligations that first appeared in the JSD, Plan of Action, and Appendix A that Defendants had not yet satisfied." *Id.*

The court also took issue with Defendants' characterization of the 2012 Order as finding no ongoing violations of federal law. The court clarified that it had made no findings in its 2012 Order on continuing violations of federal law. *Id.* Although Plaintiffs had argued that Defendants violated the Rehabilitation Act and the ADA, the court ruled then that "there was not sufficient evidence of discrimination under" either Act. *Id.* But the court explained that it was not asked, and thus made no findings on, whether Defendants otherwise continued to violate class members' constitutional rights. *Id.* With respect to the 2016 motion to terminate oversight, the district court likewise did not resolve the question of current compliance with federal

18

law, stating it "is not in the position to assess, and, therefore, cannot conclude that Defendants are no longer violating constitutional or federal law." *Id.* at \*16. But "[b]ecause all of [the] outstanding obligations grew out of the Court's 1990 Order and/or the related 2012 findings of violations," the district court concluded that "Defendants have not convinced the Court that they have satisfied the essential purposes of the JSD, Plan of Action, Appendix A, and Revised Table IV." *Id.* at 16.

The court then rejected Defendants' claim that principles of federalism dictated the termination of oversight. The court acknowledged that the Supreme Court, in *Horne v. Flores*, 557 U.S. 433 (2009), stated that federalism concerns are heightened when a consent decree has the effect of dictating state budget allocations. *Id.* And it conceded that "increasing fees and costs associated with this litigation are detrimental to the State's interest." *Id.* But the court reasoned that "first and foremost," the *Horne* Court asked if the State had fulfilled its obligations under federal law and achieved the objectives of the pertinent order. *Id.* The district court answered that question in the negative, stating: "Unlike *Horne*, Defendants have not shown that they have fulfilled their outstanding obligations, 'by other means.'" *Id.* at \*17 (quoting *Horne*, 557 U.S. at 439).

Ultimately, the court concluded that Defendants "have not come close to showing that vacatur of all of the orders and decrees is suitably tailored to the proposed changed circumstances." *Id.* Nor have Defendants "demonstrated that a durable remedy is in place sufficient to justify vacatur of all of the Court's orders." *Id.* at \*18. In other words, Defendants had not shown "that it is unlikely that the

19

prohibited conditions or actions will recur." *Id.* (quoting *LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 111 (D.D.C. 2010), *aff'd sub nom. LaShawn A. ex rel. Moore v. Gray*, 412 F. App'x 315 (D.C. Cir. 2011)). The court therefore denied the motion.

## II.     ANALYSIS

On appeal, Defendants assert that the district court abused its discretion when it denied their Rule 60(b)(5) motion. Defendants contend significant changes in factual circumstances warrant termination of all consent decrees and of the court's oversight. Specifically, they claim that compliance with the decrees has become substantially more onerous, the decrees have become unworkable due to unforeseen obstacles, and continued enforcement of the decrees would be detrimental to the public interest. They also argue that the district court misapplied *Horne* by requiring them to show attainment of specific essential purposes identified by the district court rather than compliance with federal law.

### A.     *Appellate Jurisdiction*

Before addressing the merits, we must first resolve the parties' dispute about whether the district court's June 2016 order is a final, appealable order under 28 U.S.C. § 1291. We have appellate jurisdiction over "final decisions of the district courts of the United States." 28 U.S.C. § 1291. "A 'final decision' is ordinarily one that 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Hayes Fam. Tr. v. State Farm Fire & Cas. Co.*, 845 F.3d 997, 1003 (10th Cir. 2017) (quoting *Catlin v. United States*, 324 U.S. 229, 233

20

(1945)); *see also D&H Marketers, Inc. v. Freedom Oil & Gas, Inc.*, 744 F.2d 1443, 1444 (10th Cir. 1984) (en banc) (stating that § 1291 "has consistently been held to require the termination of all matters as to all parties and causes of action before an appeal may be taken"). "[P]ut differently," a final decision is "one by which the district court 'disassociates itself from a case.'" *McClendon v. City of Albuquerque*, 630 F.3d 1288, 1292 (10th Cir. 2011) (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 42 (1995)). Although "a final judgment is the paradigmatic 'final decision' appealable under § 1291," not "every case with a final judgment in it is appealable." *Id.* Instead, "every post-judgment decision must be assessed on its *own terms* to determine whether it is a final decision amenable to appeal." *Id.* at 1293.

As relevant here, "[t]he general rules governing our review of a district court's order granting or denying a Rule 60(b) motion are fairly well settled." *Stubblefield v. Windsor Capital Grp.*, 74 F.3d 990, 993 (10th Cir. 1996). "We have jurisdiction under 28 U.S.C. § 1291 to reach the merits of an appeal from a denial of a Rule 60(b) motion, provided the ruling or judgment the Rule 60(b) motion challenged was a final decision of the district court." *Id.* (internal quotation marks omitted); *see also McClendon*, 630 F.3d at 1294 (recognizing that a district court's denial of a Rule 60(b) motion "usually qualif[ies] as [a] final decision[] for purposes of § 1291 because [it] usually signal[s] that the district court's business is done, that it has disassociated itself from the case, [and] that we may act without stepping on the district court's toes").

21

Here, Defendants moved under Rule 60(b) to vacate all pertinent orders—the JSD, the Plan of Action, Appendix A, and Revised Table IV—and to terminate this case. The parties and district court agree that the pertinent orders are consent decrees. *See Jackson III*, 2016 WL 9777237, at *9. And all agree that consent decrees are, in effect, final decisions within the meaning of Rule 60(b). *See Johnson v. Lodge #93 of Fraternal Order of Police*, 393 F.3d 1096, 1101 (10th Cir. 2004) ("A consent decree is a negotiated agreement that is entered as a judgment of the court. Consent decrees . . . have characteristics both of contracts and of final judgments on the merits." (internal quotation marks omitted)); *see also V.T.A., Inc. v. Airco, Inc.*, 597 F.2d 220, 224 (10th Cir. 1979) (noting that when "the underlying judgment was by consent [it] has the same force and effect for [Rule] 60(b) purposes as a judgment rendered on the merits following trial"). Because the pertinent orders are consent decrees that are final orders under Rule 60(b), it necessarily follows that the district court's June 2016 order denying relief under Rule 60(b)(5) from those consent decrees is also final and appealable under § 1291. *See Jeff D. v. Kempthorne*, 365 F.3d 844, 850 (9th Cir. 2004) ("Because consent decrees are considered final judgments we have jurisdiction to review the claims raised in the motion to vacate the consent decrees pursuant to 28 U.S.C. § 1291." (citation omitted)).

Plaintiffs disagree. Relying on *McClendon*, they argue the district court's June 2016 order is not a final, appealable order because it signals that more litigation is on the way. Plaintiffs believe future litigation will occur when they inevitably file another motion for remedial relief to remedy Defendants' noncompliance with the

22

consent decrees. In other words, the June 2016 Order is not final because the district court will continue to monitor Defendants' compliance with its prior consent decrees (i.e., the JSD, the Plan of Action, Appendix A, and Revised Table IV).

But under *McClendon*, that the district court may have to continue to oversee Defendants' compliance with the consent decrees is not enough to strip the June 2016 order of its status as a final decision. Instead, the relevant inquiry is whether the June 2016 order will result in more litigation *on the merits* in the district court. *See McClendon*, 630 F.3d at 1292–94. If the June 2016 order "ensures litigation on the merits will continue in the district court," then it is not final under § 1291. *Id.* at 1293. But if it does not, and it is otherwise a denial of a Rule 60(b) motion challenging a final decision of the district court, then it is a final decision under § 1291. *See id.* at 1293–94; *Jeff D.*, 365 F.3d at 850.

Under this formulation, the June 2016 order is a final, appealable decision. First, the June 2016 order does not signal that more litigation on the merits is on the way. In fact, the 1990 order, which followed a lengthy trial, resolved the merits of the litigation, and the district court retained jurisdiction only to oversee implementation of the ensuing consent decrees. Second, as discussed above, the 2016 order denied a Rule 60(b) motion challenging several final decisions of the district court.

To be sure, the June 2016 order does not result in the district court dissociating itself from the case. Much the opposite, it means the district court will, as it has since it issued the 1990 Order, continue to oversee Defendants' compliance with the pertinent consent decrees. But this fact alone does not deprive us of jurisdiction.

23

After all, each decree was a final, appealable decision under § 1291, even though the district court continued to oversee each decree's implementation. *See Johnson*, 393 F.3d at 1101; *V.T.A.*, 597 F.2d at 224. If the district court's continued oversight would not have divested us of appellate jurisdiction then, it should not do so now.

In sum, the finality test asks whether the ruling challenged in the denied Rule 60(b) motion was "a final decision of the district court." *Stubblefield*, 74 F.3d at 993. Here, that test is met. The June 2016 order is a final, appealable order and, thus, we have appellate jurisdiction under § 1291.

## B.     *The Rule 60(b)(5) Motion*

We now turn to Defendants' argument that termination of all pertinent orders and of this case is appropriate due to significant changes in factual circumstances. Our analysis proceeds in three parts. First, we discuss the relevant standard of review. Second, we outline the law governing Rule 60(b)(5) motions in institutional reform litigation. Third, we apply that standard to the facts of this case.

### 1.     Standard of Review

We review a district court's denial of a Rule 60(b) motion for an abuse of discretion. *Servants of Paraclete v. Does*, 204 F.3d 1005, 1009 (10th Cir. 2000). In the Rule 60(b) context, we review the district court's ruling only "to determine if a definite, clear or unmistakable error occurred below." *Zurich N. Am. v. Matrix Serv., Inc.* 426 F.3d 1281, 1289 (10th Cir. 2005) (internal quotation marks omitted). "A reviewing court may reverse only if it finds a complete absence of a reasonable basis and is certain that the decision is wrong." *Id.* (internal quotation marks omitted). "A

24

clear example of an abuse of discretion exists where the trial court fails to consider the applicable legal standard or the facts upon which the exercise of its discretionary judgment is based." *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997). An appeal from the denial of a Rule 60(b) motion raises for our review only the district court's order denying the motion, and not the underlying judgment itself. *Servants of Paraclete*, 204 F.3d at 1009.

## 2. Legal Standard

A Rule 60(b) motion for relief from judgment is an extraordinary remedy and may be granted only in exceptional circumstances. *Id.*; *see V.T.A., Inc.*, 597 F.2d at 223 n.7 (10th Cir. 1979). The motion may not be used as a substitute for direct appeal. *See Servants of Paraclete*, 204 F.3d at 1009.

Rule 60(b)(5) permits relief from a judgment or order if "[1] the judgment has been satisfied, released, or discharged; [2] it is based on an earlier judgment that has been reversed or vacated; *or* [3] applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5) (emphasis added). Use of the disjunctive "or" demonstrates "that each of the provision's three grounds for relief is independently sufficient and therefore that relief may be warranted even if [a movant has] not 'satisfied' the original order." *Horne v. Flores*, 557 U.S. 433, 454 (2009). Defendants seek relief on the ground that ongoing enforcement of the pertinent decrees is no longer equitable.

We now turn to a discussion of the limits of federal involvement in institutional reform litigation and of the two leading Supreme Court cases addressing

25

the no-longer-equitable basis for Rule 60(b)(5) relief: *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), and *Horne v. Flores*, 557 U.S. 433 (2009).

a.      *Consent Decrees Generally*

A consent decree "entered in federal court must be directed to protecting federal interests." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004). The consent decree "must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction." *Id.* (citing *Firefighters v. Cleveland*, 478 U.S. 501, 525 (1986)).

Equity requires a federal court fashioning and implementing a consent decree to focus on three factors. *See Milliken v. Bradley*, 433 U.S. 267, 280 (1977). First, a federal consent decree must "be remedial in nature" and thus "designed as nearly as possible to restore the victims of [illegal] conduct to the position they would have occupied in the absence of such conduct." *Id.* at 280 (internal quotation marks omitted).

Second, the nature and scope of the remedy provided by a federal consent decree depends on the nature and scope of the federal-law violation. *Id.* at 280, 282. This means a "federal-court decree[] must directly address and relate to the [federal-law] violation itself." *Id.* at 282. And it must be "tailored to cure the condition that offends" federal law. *Id.* (internal quotation marks omitted). But a decree exceeds appropriate limits if it is "aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." *Id.*

Third, federal courts "must take into account the interests of state and local authorities in managing their own affairs," consistent with the demands of federal

26

law. *Id.* at 280–81. Indeed, principles of federalism require that federal courts give "significant weight to the views of government officials," and that "state officials with front-line responsibility for administering [a state program] be given latitude and substantial discretion." *Frew*, 540 U.S. at 442 (internal quotation marks omitted).

Importantly, federal consent decrees are temporary solutions that may be kept in place only as long as necessary to cure an unlawful condition. *See Missouri v. Jenkins*, 515 U.S. 70, 88-89 (1995). The Supreme Court has cautioned that federal courts should not continue their "oversight of state programs for long periods of time . . . absent an ongoing violation of federal law." *Frew*, 540 U.S. at 441. Thus, a "federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Id.* at 442. Keeping a consent decree in place any longer than necessary to assure compliance with federal law risks violating principles of federalism and "improperly depriv[ing] future officials of their designated legislative and executive powers." *Id.* at 441; *see also John B v. Emkes*, 710 F.3d 394, 398 (6th Cir. 2013) (stating that a consent decree "may remain in force only as long as it continues to remedy a violation of federal law"); *United States v. Washington*, 573 F.3d 701, 710 (9th Cir. 2009) ("The [Supreme] Court has repeatedly reminded us that institutional reform injunctions were meant to be temporary solutions, not permanent interventions, and could be kept in place only so long as the violation continued.").

b.     Rufo v. Inmates of Suffolk County Jail

In *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 372 (1992), pretrial detainees held at a county jail in Massachusetts sued the county, state, and related entities, claiming they were being held under unconstitutional conditions. The district court ruled that conditions at the jail were constitutionally deficient; thus, the district court enjoined the state defendants from, among other things, housing two or more inmates in a single cell. *Id.* at 372–73. When conditions at the jail did not improve, the district court ordered the state defendants to renovate another existing facility to serve as a substitute detention center. *Id.* at 373–74. The First Circuit affirmed and ordered that the jail be closed unless the state defendants timely presented a plan to create a constitutionally adequate facility for the pretrial detainees. *Id.* at 374.

Days before the deadline to present a plan for a new facility, the state defendants submitted a plan to create a substitute facility with only single-occupancy cells, and the district court entered a consent decree obligating the state defendants to construct a facility containing 309 single occupancy rooms. *Id.* at 374–75. When the inmate population outpaced population projections, the parties moved the district court to modify the decree to provide a facility with an increased number of cells. *Id.* at 375–76. The district court granted the modification on the condition that "single-cell occupancy is maintained" under the new plan for the facility. *Id.* at 376.

The state defendants again moved to modify the consent decree, this time to allow for double bunking of male detainees in roughly one-third of the cells in the new jail. *Id.* The state defendants attributed the need for a second modification to a

28

further increase in the population of pretrial detainees. *Id.* The state defendants argued that the continued increase in the pretrial detainee population—a change in fact—coupled with a change in law regarding the constitutionality of double bunking pretrial detainees, *see Bell v. Wolfish*, 441 U.S. 520 (1979), supported the requested modification. *Rufo*, 502 U.S. at 376. The district court denied the motion, in part, because the state defendants failed to make a "clear showing of [a] grievous wrong evoked by new and unforeseen conditions." *Id.* at 377 (quoting *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932)). The district court explained that modification would violate a primary purpose of the decree—to provide for a separate cell for each detainee—although it never decided whether double celling would be unconstitutional. *Id.* at 377. The First Circuit affirmed. *Id.*

The Supreme Court granted certiorari and remanded so the lower courts could apply the proper standard to modification requests under Rule 60(b)(5). *See id.* at 393. The Court began by emphasizing the need for flexibility when considering a motion for modification of a consent decree in institutional reform litigation. *Id.* at 380–83. After all, consent decrees in such cases "often remain in place for extended periods of time, [meaning] the likelihood of significant changes occurring during the life of the decree is increased." *Id.* at 380. The Court further explained that the experience of the Courts of Appeals "demonstrated that a flexible approach is often essential to achieving the goals of reform litigation," as the Courts of Appeals observed that consent decrees frequently "reach beyond the parties involved directly

29

in the suit and impact [] the public's right to the sound and efficient operation of its institutions." *Id.* at 381 (internal quotation marks omitted).

The Court then outlined what a movant must show when seeking modification of a consent decree under Rule 60(b)(5). The party seeking modification of a consent decree bears the burden of showing that "a significant change either in factual conditions or in law" warrants revision of the decree. *Id.* at 384. Changed factual circumstances may warrant modification of a consent decree when the changed circumstances "make compliance with the decree substantially more onerous," when "a decree proves to be unworkable because of unforeseen obstacles," or when "enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384. A party need not show that a change in fact was both unforeseen and unforeseeable. *Id.* at 385.

Conversely, a court should deny a party's request for a modification under Rule 60(b)(5) if the party merely establishes that "it is no longer convenient [for the moving party] to live with the terms of a consent decree." *Id.* at 383. Furthermore, a modification should be denied "where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385. The Court explained:

> If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).

*Id.*

30

If a party meets its burden of establishing a change in fact that warrants modification of a consent decree, the district court should examine "whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 391. This analysis focuses on whether the proposed modification "is tailored to resolve the problems created by the change in circumstances." *Id.* In performing this analysis, a court must bear in mind that the public interest and principles of federalism require a federal court to defer to state or local government officials and to consider a state or local government's financial constraints. *Id.* at 392. But a modification "must not create or perpetuate a constitutional violation." *Id.* at 391. Additionally, in accord with the requirement that a modification be tailored to the change in circumstances, the existence of a change in circumstances often will not justify a modification to the consent decree that lowers the terms of the consent decree to "the constitutional floor." *Id.* In this sense, a court modifying a consent decree may "do no more" to the consent decree than is warranted by the change in circumstances and "should not 'turn aside to inquire whether some of the provisions of the decree . . . could have been opposed with success if the defendants had offered opposition.'" *Id.* at 391-92 (quoting *United States v. Swift & Co.*, 286 U.S. 106, 116-17 (1932)). Thus, even where a change in circumstances occurs, the plaintiff will retain those benefits secured under the consent decree that are not impugned by the change in circumstances. *See id.*

The Court then instructed the district court on remand to first consider whether the purported change in factual circumstances—the upsurge in the pretrial detainee

31

population—was foreseen by the state defendants. *Id.* at 385. But the Court also advised that the district court erred by concluding that modification was inappropriate simply because it would not provide for a separate cell for each detainee. The Court explained:

> Even if the decree is construed as an undertaking by [the state defendants] to provide single cells for pretrial detainees, to relieve [them] from that promise based on changed conditions does not necessarily violate the basic purpose of the decree. That purpose was to provide a remedy for what had been found, based on a variety of factors, including double celling, to be unconstitutional conditions obtaining in the [jail]. If modification of one term of a consent decree defeats the purpose of the decree, obviously modification would be all but impossible. That cannot be the rule. The District Court was thus in error in holding that . . . modification of the single cell requirement was necessarily forbidden.

*Id.* at 387.

c.     Horne v. Flores

In *Horne v. Flores*, 557 U.S. 433, 439 (2009), the Supreme Court was again tasked with determining whether the lower courts applied the correct standard in denying a Rule 60(b)(5) motion. There, a class of English Language-Learner (ELL) students and their parents in Arizona sued the state for violating the Equal Educational Opportunities Act of 1974 (EEOA), which requires a state "to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." *Id.* at 438–39. After a trial, the district court concluded that "defendants were violating the EEOA because the amount of funding the State allocated for the special needs of ELL students (ELL incremental

funding) was arbitrary and not related to the actual funding needed to cover the costs of ELL instruction." *Id.* at 441.

Over the next several years, the district court entered various additional orders and injunctions aimed at improving the state's ELL incremental funding. *Id.* For instance, the court ordered the state to "prepare a cost study to establish the proper appropriation to effectively implement ELL programs." *Id.* (internal quotation marks omitted). And it later required the state to, within ninety days of the order's issuance, "appropriately and constitutionally fund the state's ELL programs taking into account the [court's] previous orders." *Id.* After the state failed to comply with these orders, the district court held the state in contempt and imposed a fine for every day until the state came into compliance. *Id.* at 442.

After accruing over $20 million in fines, the state legislature passed HB 2064, a bill that was designed "to implement a permanent funding solution to the problems identified" by the district court. *Id.* The Governor allowed HB 2064 to become law without her signature, and the state presented it to the district court for approval. *Id.* at 443. Because the Governor did not approve of HB 2064's funding provisions, two members of the state legislature intervened to support the bill. *Id.* Intervenors then moved to "purge" the district court's contempt order in light of HB 2064 and, in the alternative, for relief under Rule 60(b)(5) based on changed circumstances. *Id.* The district court denied the Rule 60(b)(5) motion because HB 2064 "did not establish a funding system that rationally relates funding available to the actual costs of all elements of ELL instruction." *Id.* at 444 (internal quotation marks omitted). The

Ninth Circuit affirmed, stating that "relief would be appropriate only if petitioners had shown either that there are no longer incremental costs associated with ELL programs in Arizona or that Arizona had altered its funding model." *Id.* at 445 (internal quotation marks omitted).

The Supreme Court reversed. The Court first reiterated that a party may move to modify or vacate an order under Rule 60(b)(5) if "'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Id.* at 447 (quoting *Rufo*, 502 U.S. at 384). "[O]nce a party carries this burden, a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Id.* at 447–49 (internal quotation marks omitted).

The Court then stressed that Rule 60(b)(5) serves an important function in institutional reform litigation for three reasons. *Id.* First, injunctions and consent decrees in such cases often remain in place for many years, "and the passage of time frequently brings about changed circumstances" (e.g., "changes in the nature of the underlying problem" and "new policy insights") "that warrant reexamination of the original judgment." *Id.* at 448. Second, injunctions and decrees in reform cases tend to "raise sensitive federalism concerns" because such cases often "involve[] areas of core state responsibility." *Id.* And those federalism concerns "are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities." *Id.*

Recognizing that states have limited resources, the Court expressed sensitivity toward the fact that "[w]hen a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs." *Id.* Third, seemingly endless injunctions and decrees in these types of cases commonly "bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.* at 449 (quoting *Frew*, 540 U.S. at 441). Successor officials may bring new insights and solutions to ongoing "problems of allocating revenues and resources," but overbroad or outdated decrees may inhibit their ability to respond to those problems and fulfill their duties as democratically-elected officials. *Id.* In sum, a long-lasting and unmodified consent decree not only raises serious federalism concerns but it may also restrain the opportunities for the class protected by the decree because an overbroad and unyielding decree limits financial resources available to governments for the implementation of new innovations and policies that may serve the needs of the protected class better than the requirements embodied in the decree.

For the foregoing reasons, courts must take a flexible approach to motions under Rule 60(b)(5) where the moving party seeks relief from a long-lasting decree. *Id.* at 450. This flexible approach "seeks to return control to state and local officials as soon as a violation of federal law has been remedied." *Id.* at 451. To that end, courts must be wary "that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law or does not flow

35

from such a violation.'" *Id.* at 450 (quoting *Milliken*, 433 U.S. at 282). "'If a federal consent decree is not limited to reasonable and necessary implementations of federal law,' it may 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.* (quoting *Frew*, 540 U.S. at 441).

Accordingly, "a critical question in [the] Rule 60(b)(5) inquiry is whether the objective of the [challenged decree] has been achieved." *Id.* (citing *Frew*, 540 U.S. at 442). "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.* (citing *Milliken*, 433 U.S. at 282).

Applying these standards, the Court in *Horne* concluded that the Ninth Circuit erred in two ways. First, instead of applying a flexible approach, the Ninth Circuit "used a heightened standard that paid insufficient attention to federalism concerns." *Id.* at 451. Based on the federalism concerns, application of a flexible approach was "critical." *Id.* at 452. The Court instructed that application of the flexible approach requires that "'[w]hen the objects of the decree have been attained'—namely, when [compliance with federal law] has been achieved—'responsibility for discharging the State's obligations must be returned to the State and its officials.'" *Id.* (quoting *Frew*, 540 U.S. at 442).

Second, the Court held that instead of "inquiring broadly into whether changed conditions in [the schools] provided evidence of an ELL program that complied with the EEOA," *id.* at 451, the Ninth Circuit performed an inquiry that was "too narrow," "focus[ing] almost exclusively on the sufficiency of incremental funding," *id.* at 452. But the narrow inquiry—focusing on whether a prior judgment has been satisfied—

36

addresses only one of the bases for relief under Rule 60(b)(5) and fails to consider whether relief is warranted because "applying [a judgment] prospectively is no longer equitable." *Id.* at 454. For purposes of the equity basis for modification, the Ninth Circuit's narrow inquiry also overlooked the possibility that specific items in an initial decree may, with the passage of time and changing circumstances, no longer be the only way, or even the best way, to attain the objects of the decree and assure compliance with federal law. *See id.* at 447–48, 451–54.

To determine whether relief was proper under the equity basis for modification, the Ninth Circuit "needed to ascertain whether ongoing enforcement of the original order was supported by an ongoing violation of federal law." *Id.* at 454 (citing *Milliken*, 433 U.S. at 282); *see also id.* at 468 (repeating that a proper Rule 60(b)(5) inquiry should ask whether the school district "is now providing equal educational opportunities to ELL students").

The Court explained that while the Ninth Circuit focused on ELL incremental funding, "funding is simply a means [of complying with the EEOA], not the end (here, the EEOA)." *Id.* at 454–55. By requiring the state "to demonstrate 'appropriate action' [mandated by the EEOA] through a particular funding mechanism, the Court of Appeals improperly substituted its own educational and budgetary policy judgments for those of the state and local officials to whom such decisions are properly entrusted." *Id.* at 455. Stated otherwise, the Ninth Circuit should have "consider[ed] the broader question whether, as a result of important changes during

37

the intervening years, the State was fulfilling its obligation under the EEOA by other means." *Id.* at 439.

The Court then remanded for the district court to make "up-to-date" findings and to consider whether four changed circumstances advanced by the defendants warranted releasing the state from the earlier judgment. *See id.* at 469–70.

d.   *Applicability of* Horne *& Tension between* Horne *and* Rufo

As opposed to the present case that features a Rule 60(b)(5) motion seeking a modification of a consent decree, *Horne* involved a Rule 60(b)(5) motion seeking a modification of a court-issued injunction, as well as additional orders crafted by the district court. *See id.* at 441. Lower courts have reached different conclusions regarding the force of *Horne* in the context of a Rule 60(b)(5) motion seeking modification of a consent decree. *See Burt v. Cty. of Contra Costa*, 2014 WL 253010, at \*18–19 (N.D. Cal. Jan. 22, 2014) (discussing opposing conclusions by district courts that have analyzed extent of *Horne*'s applicability to consent decrees); *see also Evans v. Fenty*, 701 F. Supp. 2d 126, 165–67, 170–71 (D.D.C. 2010) (questioning applicability of *Horne* to modification of consent decree and relying primarily on inquiry established in *Rufo* and *Frew* when evaluating propriety of enforcement beyond minimum requirements of federal law). The Sixth Circuit, however, did not express any hesitation regarding applying *Horne* to a Rule 60(b)(5) motion seeking modification of a consent decree. *See John B.*, 710 F.3d at 411–14. In fact, the Sixth Circuit, in *John B.*, concluded that where a defendant subject to a consent decree in institutional reform litigation has implemented a durable remedy to cure the federal

38

violation underlying the decree, *Horne*'s admonition that continued enforcement of the decree is "improper" controls and requires vacatur of the consent decree. *Id.* at 411–13.

Three considerations compel us to join the Sixth Circuit's apparent conclusion that *Horne* fully applies to a Rule 60(b)(5) motion seeking modification of a consent decree. First, while the parties may form the essential terms of a consent decree, as we noted earlier when discussing our jurisdiction over this appeal, a district court's order approving the consent decree is tantamount to a final judgment on the merits. *See supra* 22 (citing *Johnson*, 393 F.3d 1096, 1101 (10th Cir. 2004)).

Second, when discussing the proper inquiries for evaluating a Rule 60(b)(5) motion in institutional reform litigation, *Horne* uses "consent decree" or "decree" interchangeably with injunction and court order even though *Horne* involved requested modifications to an injunction and several court orders but did not involve a consent decree. *See Horne*, 557 U.S. at 448–50. From this, we glean that the Court considers a consent decree and an injunctive order equivalent for purposes of evaluating a Rule 60(b)(5) motion for modification. And had the Court intended to limit *Horne* to institutional reform litigation involving only injunctions and court crafted orders, it could have easily done so explicitly. The Court, however, did not so limit its holding, and the plain language of *Horne* supports the conclusion that the decision applies with equal force to all institutional reform cases, including those cases featuring consent decrees.

39

Third, the same federalism concerns at the heart of *Horne* are present in institutional reform cases featuring consent decrees. Admittedly, the acquiescence of state or local governmental officials to the terms of a consent decree might diminish federalism concerns at the inception of the decree. But where, as here, a consent decree remains in effect for decades, enforcement of the decree necessarily interjects a federal court into local affairs and binds local governmental officials who were not parties to the consent decree. The federal court, thereby, effectively limits the democratic process by restricting the array of resources available to the governmental officials for the enactment of other policies.

Applying *Horne* to Rule 60(b)(5) motions for modifications to consent decrees does not come without complication. Notably, an apparent tension exists between *Horne* and *Rufo* with respect to the appropriate course of action where a party seeking modification has brought itself into compliance with federal law but has not substantially complied with the specific terms of the consent decree or court order. *Compare Horne*, 557 U.S. at 450 ("If a durable remedy [addressing the federal law violation] has been implemented, continued enforcement of the order is not only unnecessary, but improper."), *with Rufo*, 502 U.S. at 391 ("A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor.").

To the extent *Rufo* and *Horne* differ as to the appropriate course of action when a party seeks a Rule 60(b)(5) modification to an order in an institutional reform case, two considerations cause us to follow the course outlined in *Horne* when the

40

significant change advanced as the basis for Rule 60(b)(5) modification is the defendant's alleged ongoing compliance with federal law. First, *Rufo* involved a proposed modification to a plan that, if faithfully implemented over time, would eventually cure the federal law violation. *See id*. at 376 (describing requested modification at issue as allowing for some double bunking in new facility yet to be completed or opened). As such, unlike in *Horne* where the defendants alleged that they had remedied the federal law violation, the defendants in *Rufo* had not yet remedied the issues with overcrowding and neglect in maintaining the jail that gave rise to the litigation. And, where the *Rufo* defendants had not remedied the issues giving rise to the litigation, it naturally follows that the *Rufo* defendants, unlike the *Horne* defendants, were not in a position to establish the implementation of a durable remedy. Further, nothing in *Rufo* suggests that the proposed modification would equate with, or for that matter exceed, the constitutional floor. Thus, while *Rufo* is undoubtedly informative on many issues surrounding the Rule 60(b)(5) standard for modifying a consent decree, its statement about not striving to modify a consent decree to the constitutional floor is not germane to its decision.

Second, *Horne* represents the Court's most recent proclamation regarding the standard for obtaining a modification to an order in institutional reform litigation. And, as noted by scholars, *Horne* is the latest ruling in a trend of decisions that lower the threshold for defendants to obtain a modification to, or the dissolution of, orders in long-lasting institutional reform cases. Jason Parkin, *Aging Injunctions & the Legacy of Institutional Reform Litigation*, 70 Vand. L. Rev. 167, 193–94 & n.136

(2017) (citing Catherine Y. Kim, *Changed Circumstances: The Federal Rules of Civil Procedure and the Future of Institutional Reform Litigation After* Horne v. Flores, 46 U.C. Davis L. Rev. 1435, 1466 (2013), and Mark Kelley, Note, *Saving 60(b)(5): The Future of Institutional Reform Litigation*, 125 Yale L.J. 272, 307 (2015)).

As we read *Horne*, if a party seeking modification to a consent decree demonstrates a significant change in circumstances, the district court must take a flexible approach and consider whether the moving party has implemented a durable remedy to cure the federal law violation underlying the institutional reform litigation. *See John B.*, 710 F.3d at 412 ("In applying this flexible approach, we must answer two questions: first whether the state has achieved compliance with the federal-law provisions whose violation the decree sought to remedy; and second, whether the State would continue that compliance in the absence of continued judicial supervision."); *see also Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 569, 571 (D.C. Cir. 2011) (applying *Horne*'s statement that district court "ought to have 'applied a flexible standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied'" to context of requested modification to preliminary injunction (quoting *Horne*, 557 U.S. at 450–51)). The district court, by way of its role in overseeing the institutional reform litigation for many years, is in the best position to evaluate both whether a party has complied with federal law and, if so, whether the party is committed to ongoing compliance with federal law in the absence of oversight by the federal court. *See Petties*, 662 F.3d at 571 (recognizing that district court's management of litigation

42

"for many years" places district court in position to assess likelihood of compliance with federal law absent oversight). Likewise, the district court is also in the best position to assess whether the litigation has taken on a life of its own and now advances a purpose removed from remedying the initial violation(s) or whether continued oversight remains necessary to ensure compliance with federal law.

Finally, we note that when applying the flexible approach and evaluating whether a moving party implemented a durable remedy, a district court must consider the totality of the moving party's efforts to demonstrate sustained compliance with federal law. In this respect, there is not a single path, such as the adoption of new legislation, by which a party can demonstrate the implementation of a durable remedy. *See id.*, 662 F.3d at 569–71 (remanding for determination of whether adoption of new internal policies, coupled with improved record of compliance with federal law, satisfied durable remedy requirement). Several of the desegregation cases, although arguably not directly on point, highlight the broad inquiry a district court must undertake when determining a party's commitment to abiding by federal law. Specifically, factors that a district court may consider include the party's commitment to compliance, the duration of the party's compliance with federal law, and whether or not the effects of the violation of federal law persist. *See Freeman v. Pitts,* 503 U.S. 467, 490 (1992) (holding that the district court may relinquish desegregation control in incremental stages, and stating that: "one of the prerequisites to relinquishment of control in whole or in part is that a school district has demonstrated its commitment to a course of action that gives full respect to the equal

43

protection guarantees of the Constitution"); *id.* at 491 (listing relevant factors in determining whether partial withdrawal of federal desegregation oversight is appropriate as including whether the school district has demonstrated "its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for the judicial intervention in the first instance"); *Bd. of Educ. of Oklahoma City Pub. Sch. v, Dowell*, 498 U.S. 237, 249–50 (1991) (stating that "[t]he district court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable" while also considering the lengthy period of time during which the Board complied with the federal court's oversight).

e.    *Summary*

From the foregoing discussion of *Rufo*, *Horne*, and other institutional reform litigation cases, several principles emerge that are critical to our analysis of whether Defendants are entitled to relief under Rule 60(b)(5).

First, a motion for relief from a consent decree based on an assertion that "applying it prospectively is no longer equitable" demands a different focus than a motion based on an assertion that "the judgment has been satisfied, released or discharged." *See* Fed. R. Civ. P. 60(b)(5); *Horne*, 557 U.S. at 454. With respect to the latter ground for relief, it is appropriate for a court to focus on whether the movant has satisfied each obligation set forth in the consent decree. But where, as here, the movant contends that changed circumstances have rendered further enforcement of

44

the consent decree no longer equitable, the inquiry is whether the movant has shown (a) that a significant change in factual circumstances or in law warrants revision of the decree, and (b) that the requested modification is suitably tailored to the changed circumstance. *Rufo*, 502 U.S. at 383–84, 391. A movant may establish that changed factual circumstances warrant modification when (i) the changed circumstances "make compliance with the decree substantially more onerous," (ii) a "decree proves to be unworkable because of unforeseen obstacles," or (iii) "enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384. It is an abuse of discretion for a district court to deny a motion for modification where the moving party meets this burden. *Horne*, 557 U.S. at 447.

Second, a flexible approach to evaluating the equities of such a motion is crucial where, as in this case, institutional reform is sought. *Horne*, 557 U.S. at 450; *Rufo*, 502 U.S. at 380–81. Consent decrees in reform cases often remain in effect for extended periods, thereby increasing the prospect that a significant change in factual circumstances will occur. *Horne*, 557 U.S. at 447–48; *Rufo*, 502 U.S. at 380. Consent decrees also tend to restrict state and local officials' ability to implement new ideas to old problems. *Horne*, 557 U.S. at 449; *Rufo*, 502 U.S. at 381. And they raise sensitive federalism concerns that are heightened when a decree effectively dictates state or local budget priorities. *Horne*, 557 U.S. at 448.

Third, when a party seeks termination or vacatur of a consent decree based on the inequity of continued oversight, a court must determine not only whether changed circumstances exist, but also whether the "objective" of the decree—that is, whether

45

compliance with federal law—has been attained. *See id.* at 450 (noting that "a *critical* question in [the] Rule 60(b)(5) inquiry is whether the objective of the District Court's [initial] order—*i.e.*, satisfaction of the EEOA's 'appropriate action' standard—has been achieved" (emphasis added) (citing *Frew*, 540 U.S. at 442)); *id.* at 454 (concluding that the Ninth Circuit "*needed* to ascertain whether ongoing enforcement of the original order was supported by an ongoing violation of federal law" (emphasis added) (citing *Milliken*, 433 U.S. at 282)); *id.* at 468 (reiterating that the Ninth Circuit should have asked whether the school district was meeting the EEOA's "appropriate action" requirement); *see also Milliken*, 433 U.S. at 282 (explaining that a decree must be "tailored to cure the condition that offends" federal law and seek to restore victims of unlawful conduct to the position they would have occupied absent the unlawful conduct (internal quotation marks omitted)); *John B.*, 710 F.3d at 411 (stating that a court considering a Rule 60(b)(5) motion "*must* determine whether 'ongoing enforcement of the original order [is] supported by an ongoing violation of federal law'" (alteration in original) (emphasis added) (quoting *Horne*, 557 U.S. at 454)); *Washington*, 573 F.3d at 710 (interpreting *Horne* and *Rufo* as requiring a court to "consider whether the purpose of the decree" has been achieved). So where the basis of the Rule 60(b)(5) motion is that continued enforcement of the decree is no longer equitable, instead of inquiring narrowly whether the specific obligations of a consent decree have been attained, the court must broadly inquire whether the party obligated by the decree is at that time in compliance with federal law. *Horne*, 557 U.S. at 451–52; *see also id.* at 439 (stating that the lower courts needed to ask the

46

broader question whether the state "was fulfilling its obligation under the EEOA by other means"). And once compliance with federal law has been attained, a court must return control over the program to the state and its officials, provided a durable remedy is in place. *See id.* at 452 ("'When the objects of the decree have been attained'—namely, when EEOA compliance has been achieved—'responsibility for discharging the State's obligations [must be] returned promptly to the State and its officials.'" (alteration in original) (quoting *Frew*, 540 U.S. at 442)); *see also Frew*, 540 U.S. at 442 ("The federal court *must* exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." (emphasis added)); *Washington*, 573 F.3d at 709 ("The Constitution does not establish the district courts as permanent administrative agencies.").

Last, the existence of a durable remedy may warrant disengagement of judicial oversight. The *Horne* Court's single reference to a durable remedy states:

> [A] critical question in this Rule 60(b)(5) inquiry is whether the objective of the District Court's [initial] order—*i.e.*, satisfaction of the EEOA's "appropriate action" standard—has been achieved. *See* [*Frew*,] 540 U.S. at 442. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper. *See Milliken*, [433 U.S.] at 282.

*Horne*, 557 U.S. at 450. From the latter sentence, it is fair to conclude that if a durable remedy is in place, then the movant has attained the more-general objects of the decree—i.e., compliance with federal law. We interpret the Court's reference to a "durable remedy" as recognition that fleeting federal compliance is insufficient to

47

warrant relief. Thus, a district court, in assessing whether further oversight is equitable, may and should consider the totality of defendants' efforts to comply with federal law and defendants' commitment to remaining in compliance with federal law. Such is the approach adopted by two of our sister circuits subsequent to *Horne*. *See supra* 41-43 (discussing application of *Horne*'s durable remedy language in *John B.*, 710 F.3d 391 and *Petties*, 662 F.3d 564).

And like our sister circuits, we do not read the language in *Horne* too restrictively with respect to what may constitute a durable remedy. The Court has admonished against taking language from its opinions out of context and giving it "talismanic quality." *Rufo,* 502 U.S. at 380. Recall that, in *Rufo*, the district court denied modification of the consent decree because the state defendants had failed to meet the "clear showing of grievous wrong" evoked by the Court in *United States v. Swift & Co.,* 286 U.S. 106 (1932). *Rufo*, 502 U.S. at 377. The Court acknowledged that the "grievous wrong" language used in *Swift*, if "[r]ead out of context," "suggests a 'hardening' of the traditional flexible standard for modification of consent decrees." *Id.* at 379. It explained, however, that such a reading would be inconsistent with Rule 60(b)(5): "That Rule, in providing that, on such terms as are just, a party may be relieved from a final judgment or decree where it is no longer equitable that the judgment have prospective application, permits a less stringent, more flexible standard." *Id.* at 380. A similarly cautious reading of the "durable remedy" language in *Horne* is appropriate here.

When a Rule 60(b)(5) movant has established both the absence of an ongoing violation of federal law and a future commitment to remain in compliance with federal law, federalism concerns should inform a court's flexible determination as to how a consent decree will be modified. Rule 60(b)(5) dictates as much. *See Rufo,* 502 U.S. at 380. Accordingly, there is no one way for a movant to show that its federal compliance is more than fleeting. For example, a movant may establish its commitment to future compliance through the adoption of a durable remedy—such as a statute designed to cure the specific federal violation. *See Horne,* 557 U.S. at 450. A movant may also establish its commitment to future compliance through a record of sustained good-faith efforts to remedy federal violations and, to the extent possible, eliminate the vestiges of the federal violation. *See Freeman*, 503 U.S. at 490, 498; *Dowell*, 498 U.S. at 248–49. Ultimately, the district court's wealth of experience overseeing the litigation should inform its assessment of whether the Defendants are now in compliance with federal law, and whether they are committed to remaining in compliance.[6]

In summation, if Defendants here can show they are no longer violating the class members' federal rights, and the district court has reason to believe Defendants' compliance with federal law is durable, then "continued enforcement of the District Court's original order[s] is inequitable within the meaning of Rule 60(b)(5), and relief is warranted." *Horne*, 557 U.S. at 470; *see also John B.*, 710 F.3d at 413;

---

[6] Here, the district court has been involved with this case for three decades. It has personal knowledge of the efforts by the Defendants to meet their obligations and the complexity involved in setting compliance measures.

*Petties*, 662 F.3d at 570-71. To require more under those circumstances would raise serious federalism concerns. It also would conflict with the Supreme Court's admonition that a federal consent decree should do no more than remedy a condition that violates federal law. *Milliken*, 433 U.S. at 282. Once the offending condition has been cured, the Court has instructed that responsibility over the state program must be returned promptly to the state and its officials. *Frew*, 540 U.S. at 442; *see also Horne*, 557 U.S. at 450–51 (stating the flexible standard under Rule 60(b)(5) "seeks to return control to state and local officials as soon as a violation of federal law has been remedied"). And in weighing the equities, the district court should avoid imposing an inflexible standard that risks depriving future officials of their legislative and executive powers. *See Horne*, 557 U.S. at 449. After all, such inflexibility is unnecessary to protect the federal interests at the heart of the institutional reform litigation. If the state again violates federal law, victims may file a new lawsuit to bring the state back into compliance. Elected officials may also be held accountable to the citizenry through the political process. For all of these reasons, we conclude that Defendants may satisfy the durability required by *Horne* in a number of ways, including: by taking specific, long-term actions aimed at curing the federal violations, by making good faith efforts to obtain compliance, or by operating in conformity with federal law for a reasonable period of time.

3.      **Application**

Since this case's inception, the district court has expended considerable effort and displayed exceptional skill resolving the numerous issues that have arisen.

50

Despite this fine stewardship, two aspects of the ruling on Defendants' Rule 60(b)(5) motion require us to vacate the June 2016 order and to remand for further proceedings in the district court.

First, the district court's determination that there are no changed circumstances appears to be inconsistent with its factual findings. Defendants maintain that changed factual circumstances warrant relief, including that (a) their obligations have increased in number and complexity to the point the obligations have become substantially onerous, (b) they remedied the constitutional violations giving rise to this litigation and are in compliance with federal law, and (c) increased costs to litigate this case and to provide services to class members have inhibited the State's ability to fund other important programs such that continued enforcement of the decree is contrary to the public interest.

Although the district court concluded that Defendants "have not presented sufficient changed circumstances . . . to warrant the requested relief," *Jackson III*, 2016 WL 9777237, at *17, the court seemingly endorsed Defendants' argument that their "task ha[d] become incomprehensible, if not insurmountable," and recognized that their outstanding obligations "are onerous," *id.* at *14.[7] The court also

---

[7] Defendants may have anticipated at the time they entered into the pertinent decrees that the number and complexity of obligations would substantially increase. After all, their obligations did not become onerous as a result of changed factual circumstances occurring after they entered into the decrees—it was the act of entering into the decrees itself that multiplied their obligations. On remand, if the district court finds that Defendants anticipated that their obligations would substantially increase in number and complexity, Defendants would have to "satisfy a heavy burden to convince [the] court that [they] agreed to the decree[s] in good faith,

51

acknowledged that the "increasing fees and costs associated with this litigation are detrimental to the State's interest," that "more than 25 years of orders and stipulations have restricted the State's ability to make basic decisions concerning its budget," and that "it is doubtful that the outlay of over 5 million dollars of attorney's fees and costs every year is directly assisting" class members. *Id.* at \*16. Indeed, the district court noted that Defendants have spent more than $50 million related to this litigation in the last decade, *id.* at \*12, and that, as of 2009, the average yearly costs to provide services to class members had risen from $67,290.00 to $135,535.000 per class member, while the State's $32,992.00 per capita income was the ninth lowest in the nation, *id.* at \*13.

Despite accepting these facts advanced by Defendants, the district court concluded, without adequate explanation, that the facts did not amount to a significant change in circumstances. But the district court's conclusion that the obligations on the Defendants are "onerous" suggests Defendants established a significant change in circumstances under *Rufo*'s first two prongs for showing a change in facts warranting modification—that "changed factual conditions make compliance with the decree substantially more onerous" and that "a decree proves to be unworkable because of unforeseen obstacles." *See Rufo*, 502 U.S. at 384. Similarly, the district court's findings concerning the increased fees and costs, and how they have restricted the State's ability to make decisions about its budget,

---

made a reasonable effort to comply with the decree[s], and should be relieved of the undertaking under Rule 60(b)." *Rufo*, 502 U.S. at 385.

52

suggest that continued enforcement of the decrees is detrimental to the public interest. *See Horne*, 557 U.S. at 447 (explaining that Rule 60(b)(5) "provides a means by which a party can ask a court to . . . vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest" (internal quotation marks omitted)); *id.* at 448 ("A structural reform decree eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds[.]" (quoting *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring))); *id.* at 454 (recognizing that a decree is detrimental to the public interest when it risks "improperly interfer[ing] with a State's democratic process"); *id.* at 459 (concluding that the district court's imposition of heavy fines on the state "unquestionably imposed important restrictions on the legislature's ability to set budget priorities"); *Small v. Hunt*, 98 F.3d 789, 796 (4th Cir. 1996) (stating in a Rule 60(b)(5) case that the public "has an interest in how its tax dollars are spent"). We remand for further explanation of why these facts do not constitute a significant change in circumstances.[8]

---

[8] To be sure, the district court questioned the timing of the changes relative to the Defendants' pending, August 25, 2015, Rule 60(b)(5) motion. This explanation, however, may not justify rejecting the conclusion that a significant change in circumstances occurred where (1) Defendants filed a Rule 60(b)(5) motion in 2011 that the district court terminated without ruling on the merits of the motion and (2) the district court made no reference to the requirement in Fed. R. Civ. P. 60(c)(1) that a Rule 60(b) motion be "made within a reasonable time." Of course, on remand, the district court is free to perform a Rule 60(c)(1) timeliness analysis and conclude that, even in light of the 2011 Rule 60(b)(5) motion, Defendants did not seek relief "within a reasonable time" of the change in circumstances upon which they rely.

53

Second, federalism concerns are heightened here because the decrees and the court's continued oversight have "the effect of dictating state . . . budget priorities." *Horne*, 557 U.S. at 448. Despite acknowledging the federalism concerns at play, including the lengthy duration of federal oversight and the budgetary constraints resulting from continued federal oversight, the district court did not apply the flexible approach called for by *Horne*. Under the flexible approach, the district court needed to inquire whether "the objects of the decree[s] have been attained." *Id.* at 452 (internal quotation marks omitted). The court purported to engage in this analysis, stating that the objects—or "essential purposes"—of the pertinent decrees "are to provide class members with adequate health care, a reasonably safe environment, and supported employment opportunities." *Jackson III*, 2016 WL 9777237, at *14. The court then noted that these "more specific" essential purposes are encompassed in the obligations provided in the pertinent decrees. *Id.* And because Defendants conceded they have not substantially complied with many of those decree obligations, the court determined that Defendants "have not fulfilled the essential purposes of the pertinent decrees." *Id.*

Like the Ninth Circuit's analysis in *Horne*, the district court's analysis on this point was too narrow, focusing almost entirely on whether defendants had fulfilled the numerous, detailed obligations provided in the consent decrees. But because Defendants move on the ground that continued enforcement of the consent decrees is no longer equitable, the district court should have "ascertain[ed] whether ongoing enforcement of the [decrees] was supported by an ongoing violation of federal law,"

54

*see Horne*, 557 U.S. at 454—here, whether Defendants are violating class members' rights under the substantive due process component of the Fourteenth Amendment and under the Rehabilitation Act. The court explicitly declined to make this determination, stating it "is not in the position to assess, and, therefore, cannot conclude that Defendants are no longer violating constitutional or federal law." *Jackson III*, 2016 WL 9777237, at *16. In declining to make this finding, the district court failed to perform an inquiry that we, in accord with both the Sixth Circuit and the D.C. Circuit, conclude that *Horne* requires. *See Ohlander*, 114 F.3d at 1537 ("A clear example of an abuse of discretion exists where the trial court fails to consider the applicable legal standard[.]").[9]

The district court appears to have focused on whether Defendants substantially complied with the decree obligations, as well as an overly narrow view of the objects of the consent decree. Substantial compliance with all the obligations in the pertinent decrees would likely place New Mexico in compliance with federal law. But the obligations are merely a means of accomplishing that goal, not the end. *See Horne*, 557 U.S. at 454–55. On remand, the court should consider the broader question of whether the State is meeting the requirements of the Fourteenth Amendment and the Rehabilitation Act by means other than those stated in the consent decrees. *See id.* at 439. To be sure, the court concluded that "Defendants have not shown that they have fulfilled their outstanding obligations, 'by other means.'" *Jackson III*, 2016 WL

---

[9] The burden of showing compliance with federal law is, of course, on the Defendants.

9777237, at *17 (quoting *Horne*, 557 U.S. at 439). But the court seemingly focused on whether Defendants have fulfilled their decree obligations by other means, instead of focusing on the broader question of whether Defendants have fulfilled their federal-law obligations to class members by means other than those provided in the decrees.[10] Such an inquiry is critical not only to determining whether Defendants are in current compliance with federal law, but also to analyzing whether their compliance is durable. In other words, an inquiry into whether Defendants are currently in compliance with federal law is a necessary predicate to any inquiry into whether that compliance is more than merely fleeting. Unless the court properly focuses its inquiry on compliance with federal law, it cannot analyze whether any remedy adopted by the state will be effective to maintain such compliance. In turn, without analyzing whether Defendants are in compliance with federal law and, if so, whether they are likely to maintain compliance with federal law absent continued oversight, the district court was not in a proper analytical position to determine whether Defendants' proposed modification of terminating the consent decrees was properly tailored to any significant change in circumstances. Thus, after first deciding

_____

[10] The district court also justified its ruling based on its finding that the obligations set forth in the JSD, the Plan of Action, and Appendix A "all flowed from [its] original findings of violations in 1990." *Jackson III*, 2016 WL 9777237, at *15. Accepting this finding as true, all it shows is those decrees do not exceed appropriate limits of a federal-court decree. *See Horne*, 557 U.S. at 450 (stating that "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation" (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977))). But even a decree that is within appropriate bounds may be vacated where changed circumstances make prospective enforcement of the decree no longer equitable and where the movant has attained compliance with federal law.

56

whether New Mexico is now in compliance with federal law, the district court should assess whether that compliance is durable, or whether the proposed modification is not properly tailored to any change in circumstances because equity weighs in favor of further federal oversight to assure the protection of the class members' federal rights.

In sum, due to the public interests and federalism concerns, continued enforcement of the consent decrees is warranted only to the extent Defendants are in current violation of federal law or have reached only fleeting compliance. We remand so the district court can make up-to-date findings and determine whether Defendants are currently violating class members' rights under the Fourteenth Amendment and the Rehabilitation Act. On remand, the district court should conduct the necessary proceedings to develop a record that would allow it to make this determination. If the court then concludes Defendants are not violating class members' rights under federal law, the court should assess the durability of that compliance. In the event that Defendants have implemented a durable remedy, the court should next address whether vacatur of all pertinent orders and termination of this case is appropriate.

### III.    CONCLUSION

We **VACATE** the district court's June 2016 Order and **REMAND** so the court can make appropriate findings and conclusions and then reassess the equities under Rule 60(b) with the benefit of those findings and conclusions.